The Honorable _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON,

                Plaintiff,

    v.

U.S. DEPARTMENT OF COMMERCE;
HOWARD LUTNICK in his official
capacity as Secretary of Commerce;
NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION; and
LAURA GRIMM in her official capacity as
Acting Administrator of NOAA,

                Defendants.

NO. 2:25-cv-1507

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

## **INTRODUCTION**

1.    For decades, federal agencies, including the U.S. Department of Commerce and the National Oceanographic and Atmospheric Administration, have carried out statutory directives consistent with mandatory regulations when making, renewing, and terminating awards of congressionally appropriated funds.

2.    The current federal administration upended all that on January 20, 2025, when President Trump began issuing a flurry of executive orders and other directives commanding federal agencies to terminate huge swaths of federal funding deemed inconsistent with his policy priorities.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

1

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

3.      On the chopping block: more than $9 million in federal funding Washington was relying on to help communities disproportionately exposed to the adverse effects of climate change become more resilient.

4.      On the first day of his new administration, the President issued Executive Order 14151 targeting diversity, equity, inclusion, and accessibility (DEIA) efforts. Through Executive Order 14151, the President mandated agencies to, among other things, provide to the Director of the U.S. Office of Management and Budget a list of all "grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021," and to terminate all "'equity-related' grants." Exec. Order No. 14,151, 90 Fed. Reg. 8339, 8339-40 (Feb. 26, 2025).

5.      The following month, President Trump formally directed agencies—and the DOGE employees assigned to th0se agencies—to terminate funding to reduce federal spending or "reallocate spending to . . . advance the policies of my Administration." Exec. Order No. 14,222, 90 Fed. Reg. 11095, 11096 (Feb. 26, 2025).

6.      In April 2025, the President took aim at states' attempts to address climate change within their own borders, describing such efforts as "burdensome and ideologically motivated" and going so far as to direct the Attorney General of the United States to identify "State laws purporting to address 'climate change' or involving 'environmental, social, and governance' initiatives, 'environmental justice,' carbon or 'greenhouse gas' emissions" and take action to "stop the enforcement of [those] laws." Exec. Order No. 14,260, 90 Fed. Reg. 15513, 15514 (April 8, 2025).

7.      The termination of Washington's equity-focused climate resilience funding aligns with these Trump administration directives to eradicate climate action and end efforts to address systemic inequities and environmental injustice.

8.      But Congress has repeatedly recognized the importance of climate resilience, and neither the President nor executive agencies may contravene congressional intent by terminating

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

2

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

funding simply because they disagree with its purpose.

9. Nevertheless, on May 5, 2025, Defendants did exactly that. In service of implementing the Trump administration's unfettered and indiscriminate efforts to cut costs and other policy directives, Defendants unlawfully terminated two awards of federal funding intended to support climate resilience in the Washington communities that need it most.

10. Defendants' proffered grounds for terminating Washington's awards are spurious and pretextual. To support their decisions to terminate Washington's awards, Defendants rely on 2 C.F.R. § 200.340,[1] which allows agencies to terminate awards, to the greatest extent authorized by law, if: (a) the terms and conditions of the award expressly allow for termination on this basis, **and** (b) the award *no longer* effectuates the program goals or agency priorities identified at the time of the award.

11. But Defendants terminated Washington's funding expressly because the funded activities—activities that before May 2025 Defendants enthusiastically supported—are inconsistent with the Trump Administration's **new** priorities.

12. Defendants disregard the requirement that the terms and conditions specify the basis for termination. Moreover, Defendants erroneously contend that this single phrase—*no longer effectuates agency priorities*—provides them unconstrained authority to unilaterally terminate awards at any time and with no notice or process if the agency alleges the award activities are misaligned with **new** presidential priorities, and even if the new priorities are at odds with the congressionally directed purpose of the funding.

13. Defendants' new and unexplained interpretation of § 200.340 cannot stand. They stretch the meaning of this provision beyond the brink, misconstruing the phrase "no longer" and eschewing any notice, consideration of reliance interests, or opportunity to object or appeal in favor of unlawfully terminating awards at their whim merely because they do not wish to support

---

[1] Plaintiffs refer to both 2 C.F.R. § 200.340(a)(4) (2024) and its predecessor 2 C.F.R. § 200.340(a)(2) (2021).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

3

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1    purpose of the funding.

2        14.    Washington is suffering concrete harms as a direct result of Defendants' unlawful

3    termination of its awards. Washington has invested time, effort, and non-federal funds into

4    developing and carrying out critical programs that focus on building resilience in communities

5    disproportionately affected by climate change as a result of systemic inequities. Terminating

6    funding mid-stream terminates these NOAA-approved programs; renders the State's prior work

7    and investments in these programs meaningless; eliminates and imperils jobs; and impairs

8    Washington's Climate Resilience Strategy at exactly the time it is needed most.

9        15.    Mere months before terminating Washington's climate resilience awards, NOAA

10    published its annual global and national climate reports. In January 2025, NOAA reported that

11    2024 was the warmest year since the start of global records in 1850 with an average temperature

12    at 2.32°F above the 20th century average. In North America, the annual temperature in 2024 was

13    4°F above the 1910-2000 average. The ten warmest years in the 175-year record have all

14    occurred during the last decade, and the first year to set a new global temperature—just 20 years

15    ago in 2005—is now the 13th warmest year on record.[2] Resilience to climate-related hazards is

16    more important now than ever before.



17

18

19

20

21

22

23

24

    [2] Global Climate Report, https://www.ncei.noaa.gov/access/monitoring/monthly-report/global/202413

25    (last accessed Aug. 5, 2025).

    [3] 2024 Global Temperature Anomaly Recap, https://www.climate.gov/media/16728 (last accessed Aug.5,

26    2025).

COMPLAINT FOR DECLARATORY AND     4
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

16.     Defendants' actions are unlawful because they contravene federal regulations governing the administration of federal awards and dispense with the regular procedures and process afforded to awardees under those regulations, in violation of the Administrative Procedure Act. Defendants' actions also disclaim agency responsibility, violate the Spending Clause of the U.S. Constitution, and wholly disregard bedrock separation-of-powers principles, as enshrined in the Constitution, in service of changing executive preference.

17.     In the absence of judicial relief, Washington will continue to suffer irreparable harm on an ongoing basis that will only increase with time.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(2). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act (APA). 5 U.S.C. §§ 702, 704.

19.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202, and 5 U.S.C. §§ 705-06.

20.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are agencies of the United States government and officers sued in their official capacities. Plaintiff State of Washington is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Western District of Washington.

## PARTIES

21.     Plaintiff STATE OF WASHINGTON is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

5

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1    22.    Defendant UNITED STATES DEPARTMENT OF COMMERCE (Commerce)

2    is a cabinet-level agency within the executive branch of the United States government

3    responsible for conserving most marine species and managing ocean resource use, as well as

4    weather and climate forecasting.

5    23.    Defendant HOWARD LUTNICK is the Secretary of Commerce (Secretary) and

6    is being sued in his official capacity.

7    24.    Defendant    NATIONAL    OCEANIC    AND    ATMOSPHERIC

8    ADMINISTRATION (NOAA) is a federal agency within Commerce responsible for studying

9    and predicting changes in environment, managing coastal and marine resources, as well as

10    providing the public with essential environmental information.

11    25.    Defendant LAURA GRIMM is the Acting Administrator of NOAA and is being

12    sued in her official capacity.

13    **FACTUAL ALLEGATIONS**

14
15    **A.    Building Climate Resilience is Critical in the Face of Climate Change and Equity-
       Focused Strategies are Necessary to Protect Our Most Vulnerable Communities**

16    26.    Climate change has increased the severity of heatwaves, wildfires, drought,

17    flooding, and coastal hazards in Washington. Combined with slower moving, but very real

18    climate effects such as sea level rise, ocean acidification, and the loss of mountain snowpack,

19    climate change presents risks and challenges to Washington's communities, infrastructure, and

20    natural and working lands.[4] Scientists predict the adverse effects of climate change will worsen

21    in Washington in the coming decades, resulting in increasing harms to our State's economy,

22    environment, and the health and well-being of our communities.[5]

23
       [4] *See* Wash. State Dep't of Ecology, Washington State Climate Resilience Strategy, Publication 24-01-
24    006 2023 (September 2024), (hereinafter, Washington State Climate Resilience Strategy). A true and correct copy
       of the Washington State Climate Resilience Strategy is attached hereto as Ex. A; *see also* Washington State
25    Enhanced Hazard Mitigation Plan. A true and correct copy of the Washington State Enhanced Hazard Mitigation
       Plan is attached hereto as Ex. B.
26    [5] *See* Washington State Climate Resilience Strategy, Appendix A: Washington climate projections:
       Summary by region, prepared by University of Washington Climate Impacts Group.

COMPLAINT FOR DECLARATORY AND    6    ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE RELIEF    Environmental Protection Division
NO. 2:25-cv-1507    800 Fifth Avenue STE 2000
    Seattle, WA 98104
    (206) 464-7744

1      27.    As the U.S. Global Change Research Program[6] articulated in the Fifth National

2    Climate Assessment, "ongoing systemic oppression disproportionately exposes frontline

3    communities in the Northwest—including low-income urban communities of color; rural and

4    natural resource dependent communities; and tribes and indigenous communities—to the

5    consequences of extreme heat, flooding, and wildfire smoke and other climate hazards. Frontline

6    communities often have fewer resources to cope with and adapt to climate change but have been

7    leaders in developing climate solutions within and outside their communities. Actions to limit

8    and adapt to climate change that prioritize climate justice and redirect investments to frontline

9    communities can advance resilience."[7]

10      28.    The Washington State Legislature has recognized the importance of addressing

11    climate change, including its disproportionate effects on vulnerable communities,[8] and in 2023,

12    directed the Washington State Department of Ecology (Ecology) to update Washington's

13    Climate Resilience Strategy.[9] The Legislature specifically directed Ecology to work with other

14    state agencies to "facilitate coordination of a state response to federal funding opportunities

---

[6] The U.S. Global Change Research Program (USGCRP) is an interagency program established by Congress through the Global Change Research Act of 1990 (Pub. L. No. 101-606, 104 Stat. 3096) (GCRA) to coordinate and integrate federal research on global change. Global change means global environmental, including alteration in climate, land productivity, water resources, atmospheric chemistry, and ecological systems that may alter Earth's capacity to sustain life. GCRA, Pub. L. 101-606, 104 Stat. 3096.

[7] M. Chang et al., Ch. 27: Northwest 27-8 *in* Fifth National Climate Assessment (A.R. Crimmins et al. eds., 2023) (hereinafter, Fifth National Climate Assessment, Ch. 27). A true and correct copy of the Fifth National Climate Assessment, Ch. 27 is attached hereto as Ex. C.

[8] Wash. Rev. Code Chapter 70A.02 (Environmental Justice law adopted in 2021).

[9] Wash. Rev. Code Chapter 70A.05 ("NOTE: Findings—Intent—2023 c 169: (1) The legislature finds that Washington is already experiencing negative community and environmental impacts due to climate change with disproportionate impacts to certain communities and populations and further finds that actions to increase climate resilience, as defined in RCW 70A.65.010, can help prevent and reduce impacts to communities and ecosystems. (2) The legislature further finds that greater cross-agency coordination on resilience, including an updated statewide climate resilience strategy, will help the state: Avoid high costs in the future; address and reduce the highest risks and greatest vulnerabilities; create more efficiencies; better leverage funding; foster more equitable outcomes; and provide for greater accountability. (3) The legislature further finds that RCW 70A.65.050 requires an updated statewide strategy for addressing climate risks and improving resilience of communities and ecosystems. Therefore, the legislature intends to direct the department of ecology to update and modernize the *2012 Integrated Climate Response Plan* with the assistance of other state agencies. (4) The legislature intends for the department of natural resources to continue pursuing climate resilience actions on the public lands they manage and to collaborate with other state agencies in statewide climate resilience efforts.)

COMPLAINT FOR DECLARATORY AND     7
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

related to climate resilience."[10]

29.     Ecology developed Washington's updated Climate Resilience Strategy in coordination with partner agencies and institutions, including the Washington Departments of Health (DOH) and Commerce (DOC) and the University of Washington Climate Impacts Group (CIG), as well as tribes and representatives from disproportionately affected communities to ensure, among other things, that all Washington communities become more resilient to the adverse effects of climate change in a way that reduces health disparities and systemic inequities; allows Washington's economy to thrive through workforce adaptation to a changing climate; and ensures that Washington's infrastructure is resilient to climate-related hazards.[11]

**B.   Climate Resilience Initiatives Are Consistent with NOAA's Purpose and Congress Has Repeatedly Provided Funding to Support Climate Resilience Initiatives**

30.     NOAA is the principal federal agency tasked with understanding and predicting changes in climate, weather, ocean and coasts; sharing that knowledge and information with others; and conserving and managing coastal and marine ecosystems and resources.[12]

31.     President Nixon created NOAA in 1970 as part of a broader reorganization plan.[13]

32.     In a message to Congress transmitted with the reorganization plan, President Nixon stated:

> As concern with the condition of our physical environment has intensified, it has become increasingly clear that we need to know more about the total environment -- land, water and air. It also has become increasingly clear that only by reorganizing our Federal efforts can we develop that knowledge, and effectively ensure the protection, development and enhancement of the total environment itself.[14]

33.     President Nixon described establishing NOAA, along with the U.S.

---

[10] Wash. Rev. Code § 70A.05.050.
[11] Washington State Climate Resilience Strategy at 20.
[12] Cong. Rsch. Serv., R47636, National Oceanic and Atmospheric Administration (NOAA): Organization Overview and Issues for Congress (updated March 4, 2025).
[13] Reorganization Plan No. 4 of 1970, 35 Fed. Reg. 15627 (October 3, 1970). Under the terms of the statutory authority under which President Nixon submitted the reorganization plan, 5 U.S.C. § 906, the plan went into effect and NOAA was created. 84 Stat. 2090; *see also* 15 U.S.C. § 1511.
[14] H.R. Doc. No. 91-366 (1970). A true and correct copy is attached hereto as Ex. D.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
NO. 2:25-cv-1507

8

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1    Environmental Protection Agency, as "a major step" in the direction of "rationally and
2    systematically" organizing the government's environmentally-related activities.[15]

3        34.    With specific regard to NOAA, he acknowledged that "[w]e face immediate and
4    compelling needs for better protection of life and property from natural hazards, and for a better
5    understanding of the total environment" and that such understanding would enable us to more
6    effectively monitor and predict the actions of the environment, "and ultimately, perhaps to
7    exercise some degree of control over them."[16]

8        35.    Consistent with the purpose of the Agency and congressional direction, NOAA
9    identifies climate resilience as a focus area under several programs the Agency administers and
10   specifically identifies climate resilience as the primary purpose or an important component of
11   funding competitions under those programs.

12       36.    In 2022 and 2023, NOAA posted notices of opportunities for funding seeking
13   Coastal Zone Management Projects of Special Merit and Climate Ready Workforce Initiative
14   proposals, respectively. Washington applied for and received federal funding for two proposals
15   to strengthen Washington's climate resilience with a focus on disproportionately affected
16   communities. Specifically, NOAA awarded Washington funding for (a) the Washington State
17   Department of Ecology's *Advancing an Equitable Framework for Coastal Resilience in*
18   *Washington State*, a Coastal Zone Management Project of Special Merit funded by the Coastal
19   Zone Management Act, and (b) the Washington State Board of Community and Technical
20   Colleges' *Tribal Stewards: Cultivating Tribal Leadership & Equity in Natural Resource*
21   *Stewardship & Climate Resilience*, a Climate Ready Workforce Initiative project funded by the
22   Inflation Reduction Act and National Sea Grant College Act. Each of these funding opportunities
23   and the awards issued thereunder represent the longstanding support for climate resilience efforts
24   from Congress and NOAA.

25
26   _____
         [15] *Id.*
         [16] *Id.*

COMPLAINT FOR DECLARATORY AND        9
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

**C.     Congress Appropriated Funds Expressly for Climate Resilience Programs and Initiatives**

**_Coastal Zone Enhancement Grants Funded by the Coastal Zone Management Act_**

37.     Congress passed the Coastal Zone Management Act (CZMA) in 1972 to, among other things, "preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations [and] to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone, giving full consideration to ecological, cultural, historic, and esthetic values." 16 U.S.C. § 1452(1)-(2).

38.     Section 309 of the CZMA (Coastal Zone Enhancement Grants) authorizes the Secretary to make grants to coastal states to fund development for federal approval of program changes that support attainment of coastal zone enhancement objectives. *See* 16 U.S.C. § 1456b(b).

39.     Under NOAA's CZMA implementing regulations, a "program change" includes, among other things, "[n]ew or revised authorities, including statutes, regulations, enforceable policies, administrative decisions, executive orders, and memoranda of agreement/understanding, that will improve a State's ability to achieve one or more of the coastal zone enhancement objectives," and "[n]ew or revised guidelines, procedures and policy documents which are formally adopted by a State and provide specific interpretations of enforceable CZM policies to applicants, local governments and other agencies that will result in meaningful improvements in coastal resource management and that will improve a State's ability to attain one or more of the coastal zone enhancement objectives." 15 C.F.R. § 923.123(a)(2), (6).

40.     Under the CZMA, NOAA is required to allocate at least ten percent and up to $10 million to Section 309 grants of all funding appropriated under Sections 306 and 306A, which

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

10

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

authorize the Secretary to make grants to coastal states to administer their coastal zone management programs and assist states with coastal resource management improvement programs, respectively.

41.    The objective of Section 309 funding is to encourage states with federally approved Coastal Zone Management (CZM) Programs to make improvements to one or more of nine statutorily defined coastal zone enhancement objectives, such as "[p]reventing or significantly reducing threats to life and destruction of property by eliminating development and redevelopment in high-hazard areas, managing development in other hazard areas, and anticipating and managing the effects of potential sea level rise . . . ." (coastal hazards). 16 U.S.C. § 1456b(a)(2).

42.    NOAA administers annual Projects of Special Merit competitions using a portion of the funding it is required to allocate to Section 309 to support innovative projects that further states' approved enhancement area strategies and focus on national enhancement priorities, such as coastal hazards.

43.    As discussed below, NOAA awarded Ecology CZMA Section 309 funding in 2023 for a Project of Special Merit to reduce environmental and health disparities in Washington by improving how its CZM Program deploys key services and supports local efforts to address coastal hazards and build long-term community resilience.

***Climate Ready Workforce Initiative funded by the Inflation Reduction Act***

44.    President Biden signed into law the Inflation Reduction Act (IRA) on August 16, 2022. *See* Pub. L. No. 117-169, 136 Stat. 1818. In enacting the IRA, Congress provided for historic investments in climate and energy to tackle the climate crisis, advance environmental justice, secure America's position as a world leader in domestic clean energy manufacturing and put the United States on a path to net-zero economy by 2050.[17]

---

[17] *President Biden's Historic Climate Agenda*, https://bidenwhitehouse.archives.gov/climate/ (last accessed Aug. 5, 2025).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

11

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

45.    NOAA received $3.3 billion under the IRA. Congress expressly appropriated to NOAA $2.6 billion, to remain available until September 30, 2026, to provide funding to coastal states, tribal governments, and institutions of higher education "for the conservation, restoration, and protection of coastal and marine habitats, [and] resources, . . . to enable coastal communities to prepare for extreme storms and other changing climate conditions, and for projects that support natural resources that sustain coastal and marine resource dependent communities, . . . and for related administrative expenses." Pub. L. No. 117-169, 136 Stat. 2028 (2022).

46.    Consistent with congressional intent, NOAA directed this $2.6 billion toward its Climate Ready Coasts and Communities Initiatives, which aims to support coastal communities' resilience to changing climate conditions through funding and technical assistance for capacity building, transformational adaptation and resilience planning, conserving and protecting fisheries and other critical resources, creating quality climate-ready jobs, and improving delivery of climate services to communities and businesses, all with a focus on environmental justice.[18]

47.    NOAA's Climate Ready Coasts and Communities Initiatives include the Climate-Ready Workforce Initiative, which invests in projects to train and place workers in existing and emerging good jobs that enhance climate resilience.[19]

48.    NOAA provided funding for its Climate Ready Workforce Initiative through the National Sea Grant College Program (Sea Grant).

49.    Established by Congress in 1966 through enactment of the National Sea Grant College Act, 33 U.S.C. § 1121(c), NOAA's Sea Grant provides a variety of funding opportunities based on its work in four focus areas: Healthy Coastal Ecosystems, Sustainable

---

[18] Nat'l Oceanic and Atmospheric Admin., *Inflation Reduction Act: Climate-Ready Coasts and Communities* (last updated July 26, 2024), https://www.noaa.gov/inflation-reduction-act/inflation-reduction-act-climate-ready-coasts-and-communities (last accessed Aug. 5, 2025).

[19] Nat'l Oceanic and Atmospheric Admin., *Climate-Ready Workforce* (last updated May 14, 2024), https://www.noaa.gov/inflation-reduction-act/inflation-reduction-act-climate-ready-coasts-and-communities/climate-ready-workforce (last accessed Aug. 5, 2025).

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

Fisheries and Aquaculture, Resilient Coastal Communities and Economies, and Environmental Literacy and Workforce Development. A federal-university partnership program, Sea Grant brings science together with communities to accomplish its mission to enhance the use and conservation of coastal, marine, and Great Lakes resources to create a strong and sustainable economy, a healthy environment, and resilient and inclusive communities.

50.    For more than 50 years, NOAA has carried out the congressionally directed purpose of the National Sea Grant College Act to promote research, education, training, and advisory service activities to increase understanding, assessment, development, utilization, and conservation of the Nation's coastal, marine, and Great Lakes communities.

51.    The National Sea Grant College Act was mostly recently reauthorized and amended by Congress and signed into law by President Trump on December 18, 2020. Pub. L. No. 116-221, 134 Stat. 1057 (2020).  The reauthorization, titled the *National Sea Grant College Program Amendments Act of 2020*, authorizes $101,325,000 in appropriations for fiscal year 2024 and $105,700,000 for fiscal year 2025. *Id.* at 1060; 33 U.S.C. 1131(a)(1)(D)-(E).

52.    Congress appropriated an additional $6 million for each of fiscal years 2021 through 2025 to fund competitive grants for priority activities, including ''University research, education, training, and extension services and activities focused on coastal resilience . . .'' 134 Stat. at 1060; 33 U.S.C. 1131(a)(2)(D).

53.    As discussed below, NOAA awarded the Washington State Board of Community and Technical Colleges (SBCTC) IRA and Sea Grant funding for a Climate-Ready Workforce Initiative in 2024 to cultivate a new generation of future tribal leaders and co-stewards (non-tribal nature resource managers) adept in integrative natural resources management and climate resilience

**D.    In Administering Congressionally Appropriated Funds Directed to Climate Resilience Work, NOAA Awarded Washington Substantial Funds**

***Ecology's Equitable Framework for Coastal Resilience***

54.    On October 6, 2022, NOAA posted to grants.gov a notice of opportunity for funding for the *CZM Projects of Special Merit Competition FY 2023* (2022 NOFO).[20]

55.    Proposals for funding under the 2022 NOFO were required to focus on specifically identified priority enhancement area objectives, which included: "Coastal Hazards: Preventing or significantly reducing threats to life and property by eliminating development and redevelopment in high-hazard areas, managing development in other hazard areas, and anticipating and managing the effects of potential sea-level rise."[21]

56.    In the 2022 NOFO, NOAA encouraged applicants and awardees to:

> advance the principles of equity and inclusion when developing and implementing their work . . . [by] paying particular attention to underserved communities and populations experiencing heightened vulnerabilities and disproportionate impacts relating to coastal access, ocean . . . resource management, and coastal hazards including climate change; and seeking engagement with, input from, and partnerships with communities, groups and individuals who have not historically been actively engaged in, or may be underrepresented in the work of state or territorial coastal management programs.[22]

57.    Indeed, applicants were expressly required to submit an equity and inclusion statement in their application describing how their proposed project would:

> broaden and/or target the participation of vulnerable and/or underserved communities through meaningful involvement in the proposed project; develop and sustain mutually-beneficial partnerships, including the potential for co-development, with vulnerable and/or underserved communities; and seek to address vulnerabilities and disproportionate impacts relating to coastal access, coastal hazards and climate change, and ocean or Great Lakes resource management.[23]

58.    The fundamental purpose of Ecology's Equitable Framework for Coastal

---

[20] 2022 NOFO. A true and correct copy of the 2022 NOFO is attached hereto as Ex. E.
[21] *Id.* at 3 (Section I.B, Program Priorities).
[22] *Id.* at 4 (Section I.B, Program Priorities).
[23] *Id.* at 12 (Section IV.B.5.e, Application and Submission Information, Content and Form of Applications, Project Description, Equity and Inclusion Statement)

14

1   Resilience was to reduce environmental and health disparities in Washington by improving how

2   its CZM Program deploys key services and supports local efforts to address coastal hazards and

3   build long-term community resilience.[24]

4       59.     To advance this purpose, Ecology allocated $150,000 to its Coastal, Floodplain,

5   and Shoreline (CFS) Management Section to update key state plans and guidance used to address

6   coastal hazards in Washington communities, as well as to update Shoreline Masters Programs

7   (SMPs) guidelines.

8       60.     Ecology planned to comprehensively update the coastal resilience strategy in the

9   Washington State Enhanced Hazard Mitigation Plan (SEHMP), a multi-agency document that

10  profiles hazards, identifies risks, and lays out strategies and actions to reduce risks to people,

11  property, the economy, the environment, and infrastructure.

12      61.     Required by the Federal Emergency Management Agency (FEMA), the SEHMP,

13  establishes coordination and monitoring processes and helps make Washington's local

14  jurisdictions eligible for grant funding and other FEMA aid. The State's Multi-Agency Hazard

15  Mitigation Workgroup, which consists of state agencies and federal partners involved in hazard

16  mitigation and resilience activities, identified that Washington needed to create a more integrated

17  and robust framework for coastal resilience in a future SEHMP update.

18      62.     Ecology also intended to develop and implement funding and grant program

19  guidelines and scoring criteria to improve the SMP competitive grant program.

20      63.     Local SMPs implement Washington's Shoreline Management Act and are the

21  primary tools for managing the use and development of the State's shorelines. Ecology works

22  closely with local governments to update SMPs to meet State requirements and developed a pilot

23  competitive grant program for SMP enhancements in 2021, under which it manages local

24  shoreline planning projects, including sea level rise planning projects. Ecology intended to

25

26  [24] Equitable Framework for Coastal Resilience Proposal at PDF 8. A true and correct copy of the
    Equitable Framework for Coastal Resilience Proposal is attached hereto as Ex. F.

COMPLAINT FOR DECLARATORY AND          15          ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE RELIEF                                         Environmental Protection Division
NO. 2:25-cv-1507                                             800 Fifth Avenue STE 2000
                                                              Seattle, WA 98104
                                                               (206) 464-7744

improve future iterations of the grant program through updates to grant program guidelines, revised equity and environmental justice criteria, additional resources and guidance related to public engagement and tribal coordination, and other improvements to make the program more accessible to communities with fewer resources.

64.    $100,000 of the award was allocated to Ecology's Applied Coastal Research and Engineering (ACRE) Section to develop a strategic plan to guide decision-making and resource allocation.

65.    Formed in 2024 through the expansion of Washington's long-running coastal monitoring program and a reorganization within Ecology's Shorelands and Environmental Assistance Program, the ACRE Section is a group of coastal scientists and engineers who provide data, research, and solutions to empower Washington's coastal communities and tribes.

66.    The ACRE Section plays a key role in Washington's CZM Program by researching physical changes along Washington's beaches, bluffs, and nearshore zones to enhance their management, protection, and restoration while reducing coastal hazards and increasing community resilience.

67.    As a result of sporadic funding, the work now carried out by the ACRE Section was previously governed by the type, amount, and source of funding it received.

68.    But the budget passed by the Washington State Legislature for the 2023-2025 biennium included a Coastal Hazards budget package that combined several coastal resilience recommendations from the Washington Coastal Marine Advisory Council related to coastal resilience assistance and coastal monitoring work areas led by the Washington CZM Program and the ACRE Section and Washington's inter-agency Coastal Hazards Organizational Resilience Team (COHORT) were established to provide hazards resilience project assistance to coastal communities and tribes.

69.    Establishing the ACRE Section allows Ecology to exercise more control over and more consistently carry out this important work, but the Section requires a strategic plan to guide

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

16

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1    future decisions and ensure technical assistance is equitably allocated to the communities most

2    vulnerable to coastal hazards like flooding and erosion.

3        70.    Ecology also planned to develop recommendations and strategic actions for the

4    newly established COHORT as part of Equitable Framework for Coastal Resilience.

5        71.    As part of the funding application process, NOAA evaluated, among other things,

6    Ecology's budget to determine if it was realistic and commensurate with the project needs and

7    timeframe. Specifically, NOAA evaluated the "reasonableness and appropriateness of the

8    proposed budget for the level of work proposed and with the expected benefits to be achieved."[25]

9        72.    On September 1, 2023, NOAA awarded Ecology the maximum amount available

10   for a single project under the 2022 NOFO, $250,000, in CZMA Section 309 funds for its

11   proposal, titled *Advancing an Equitable Framework for Coastal Resilience in Washington State*

12   (Equitable Framework for Coastal Resilience).[26]

13       73.    The Equitable Framework for Coastal Resilience award provides that the federal

14   share of costs was $250,000 and expressly states that the award "constitutes an obligation of

15   Federal funding."

16       74.    Equitable Framework for Coastal Resilience was consistent with the priorities set

17   forth in the 2022 NOFO, CZMA Section 309 and its implementing regulations, NOAA's

18   purpose, and the relevant congressional direction for the funding.

19   ***SBCTC's Tribal Stewards***

20       75.    On December 19, 2023, NOAA posted to grants.gov a notice of opportunity for

21   funding for the *2023 Inflation Reduction Act Climate Ready Workforce for Coastal and Great*

22   *Lakes States, Tribes and Territories Initiative* (2023 NOFO).[27]

---

23       [25] 2022 NOFO at 28 (Section V.A.4.a, Application Review Information, Evaluation Criteria, Project

24   Costs).
         [26] Equitable Framework for Coastal Resilience Award. A true and correct copy of the Equitable
25   Framework for Coastal Resilience Award is attached hereto as Ex. G. Ex. G includes a copy of modification to the
     award solely for the purpose of demonstrating that NOAA extended Ecology's performance period through Mar.
26   31, 2026.
         [27] *See* 2023 NOFO. A true and correct copy of the 2023 NOFO is attached hereto as Ex. H.

76.    In the 2023 NOFO, NOAA explained:

> This competition is designed to meet the emerging and existing skills needs of employers while helping workers enter good jobs, so that together they may enhance climate resilience. . . . NOAA is issuing this Notice of Funding Opportunity (NOFO) for qualified organizations to form and support partnerships that will work collaboratively to support regional economies and their associated workforces by developing training programs that build in-demand skills, offering wraparound services that allow workers to successfully enroll in and complete training, and helping workers enter or advance into good jobs that enhance climate resilience. Wraparound services allow people to overcome barriers to participate in the program, especially individuals in underserved groups. . . . NOAA heavily prioritizes efforts to reach individuals from historically underserved communities. . . . [and] the Federal Government must continue to remove barriers to the meaningful involvement of the public in such decision-making, particularly those barriers that affect members of communities with environmental justice concerns. . . . Ultimately, the purpose of this NOFO is to ensure workers in coastal states and territories are trained for and hired into quality private- and public-sector jobs in the U.S. economy that are needed to increase resilience to climate-related hazards.[28]

77.    On September 11, 2024, NOAA awarded SBCTC $9,257,231 in IRA funds through Sea Grant for its proposal, titled *Tribal Stewards: Cultivating Tribal leadership & Equity in Natural Resource Stewardship & Climate Resilience* (Tribal Stewards).[29]

78.    Led by a nine-member, governor-appointed board, SBCTC advocates, coordinates, and directs Washington's system of 34 public community and technical colleges. Each year, about 290,000 students within the SBCTC system train for the workforce, prepare to transfer to a university, gain basic math and English skills, or pursue continuing education. Students, graduates, and community partners increase quality of life and economic vitality in Washington as entrepreneurs, employees, consumers, and taxpayers.

79.    Recognizing that the adverse effects of climate change disproportionately affect

---

[28] 2023 NOFO at 2-3. For the purposes of the Climate Ready Workforce Initiative award at issue in this lawsuit, "good jobs," in addition to meeting certain criteria related to climate resilience, were required to meet criteria defined by the Departments of Labor and Commerce "Good Jobs Principles," whereby "good jobs" address benefits; diversity, equity, inclusion, and accessibility; empowerment and representation; job security and conditions; and pay, among other factors. *Id.* at 4. The Trump Administration appears to have rescinded the "Good Jobs Principles" as part of its anti-DEI efforts.

[29] *See* Tribal Stewards Notice of Award. A true and correct copy of Tribal Stewards Notice of Award is attached hereto as Ex. I.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

18

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

the ecological resilience, cultural practices, and health of tribes and the importance of tribal sovereignty and self-determination in responding to these challenges, SBCTC's Tribal Stewards championed tribal leadership and co-stewardship with non-tribal leaders, prioritizing the integration of tribal knowledge systems and community values into climate resilience strategies.

80. Specifically, SBCTC's Tribal Stewards aimed to cultivate a new generation of future tribal leaders and co-stewards adept in integrative natural resources management and climate resilience through innovative partnerships between six community and technical colleges, one four-year university, five tribal governments, seven other natural resource employers in Washington, and the CIG Group.[30]

81. To address historical barriers to advanced education and career advancement, Tribal Stewards planned to establish indigenized education pathways and workforce development initiatives that prioritize place-based employment and tribal leadership.

82. To ensure success, SBCTC designed Tribal Stewards based on specifically identified objectives with specifically identified outcomes, including deliverables related to information dissemination and a robust evaluation and monitoring of all proposed outcomes throughout the performance period.

83. For example, Tribal Stewards planned to train 2,130 students in twelve associate's, bachelor's, and master's level degree programs to become wildlife biologists, environmental scientists, and forest and conservation technicians, adept in climate resilience. It promised to deliver the first round of graduates within one year of beginning and anticipated a 75% post-graduation employment rate within six months to a year.

84. At the time of Tribal Stewards proposal, eleven employers had already committed to employ Tribal Stewards graduates in 33 internships and 465 full-time jobs.

85. Tribal Stewards anticipated building partnerships with 12 additional tribes and 18

---

[30] Tribal Stewards Proposal at PDF 21. A true and correct copy of the Tribal Stewards Proposal is attached hereto as Ex. J.

COMPLAINT FOR DECLARATORY AND      19
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

additional employers over the four-year performance period.

**Table 1: Employer Commitments and Expected Job Placements (see letters of commitment)**

| Employer | Number of Committed Job Placements Annually | Committed Jobs Over 4 years |
|---|---|---|
| Colville Confederated Tribes | 30 jobs | 120 |
| Muckleshoot Federal Corporation | 15 jobs | 45 |
| Squaxin Island Tribe | 14 jobs | 56 |
| WA Department of Natural Resources | 1 job | 4 |
| Quinault Tribe | 3 internships<br>12 jobs | 60 jobs<br>9 internships |
| Puget Sound/Olympic Peninsula Fish and Aquatic Conservation Complex | 2 internships | 8 internships |
| Makah Tribe | 9 jobs | 36 |
| Nature's Capital | 6 jobs | 24 |
| Manulife Forest Management | 12 jobs<br>4 internships | 64<br>16 internships |
| Sierra Pacific | 10 jobs | 40 |
| Washington Department of Fish and Wildlife | 4 jobs | 16 |
| **Totals** | **113 Jobs<br>9 internships** | **465 Jobs** |

86.    One of only two Climate Ready Workforce Initiatives based on partnerships between institutions of higher education and tribal governments and the only one of its scale,[31] Tribal Stewards was consistent with the priorities set forth in NOAA's 2023 NOFO, NOAA's purpose, and the congressional direction for IRA and Sea Grant funding.

87.    The Tribal Stewards Notice of Award expressly states that it "constitutes the official grant award and the obligation of Federal funding," and "contains all terms and conditions of the grant award." It also includes a NOAA-approved budget for all $9,257,2331 over the course of the performance period for the award—August 1, 2024, through July 31, 2028—and authorized the *entire* obligated amount of $9,257,2331.[32]

---

[31] Sea Grant, *NOAA's Climate-Ready Workforce for Coastal and Great Lakes States, Tribes and Territories Initiative*, https://seagrant.noaa.gov/how-we-work/topics/crw/ (last accessed Aug. 5, 2025); *see* NOAA's Climate Ready Workforce Initiative: Project Locations Map. A true and correct copy of NOAA's Climate Ready Workforce Initiative: Project Locations Map is attached hereto as Ex. K. *See also* Nat'l Oceanic and Atmospheric Admin., *Biden-Harris Administration invests $60 million to build a climate-ready workforce through Investing in America Agenda*, https://www.noaa.gov/news-release/biden-harris-administration-invests-60-million-to-build-climate-ready-workforce (last accessed Aug. 5, 2025).

[32] Tribal Stewards Notice of Award at 2-3.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

20

**E.    Defendants Terminated Washington's Awards**

***OMB's Uniform Guidance Governs Termination of Washington's Awards***

88.    The administration, including termination, of Washington's awards is governed under the U.S. Office of Management and Budget (OMB) regulations at 2 C.F.R. Part 200 (Uniform Guidance), as adopted by NOAA pursuant to 2 C.F.R. § 1327.101.

89.    NOAA identified each award as a cooperative agreement. A cooperative agreement is a legal instrument of financial assistance between a federal agency and a recipient. 2 C.F.R. § 200.1. A cooperative agreement is distinguished from a grant in that it provides for substantial involvement of the Federal agency in carrying out the activity contemplated by the award.

90.    On May 5, 2025, Defendants notified Washington that they had terminated, effective immediately, the Equitable Framework for Coastal Resilience and Tribal Stewards awards.[33]

91.    In each termination letter, NOAA purported to terminate the award because the award activities no longer effectuate agency priorities.

92.    Two versions of the Uniform Guidance are relevant here: the 2020 version (effective November 12, 2020, except for amendments to §§ 200.216 and 200.340, which became effective on August 13, 2020, Guidance for Grants and Agreements, 85 Fed. Reg. 49506 (Aug. 13, 2020)), and the 2024 version (effective on October 1, 2024, Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046 (Apr. 22, 2024)).

93.    NOAA cites 2 C.F.R. § 200.340(a)(2) (2021) as the basis for its authority to terminate Equitable Framework for Coastal Resilience and 2 C.F.R. § 200.340(a)(4) (2024) as the basis for its authority to terminate Tribal Stewards.

94.    Both versions of the Uniform Guidance provide for termination. *See* 2 C.F.R.

---

[33] A true and correct copy of the Equitable Framework for Coastal Resilience termination notice is attached hereto as Ex. L. A true and correct copy of the Tribal Stewards termination notice is attached hereto as Ex. M.

21

§ 200.340. Under both versions, agencies must "clearly and unambiguously" identify termination provisions in an award's terms and conditions. Termination based on an award no longer serving agency priorities is limited to circumstances in which the agency has specific evidence that the award no longer effectuates the priorities the award was originally intended to advance.

95.     Despite a change in structure and a modification of the language of the provision between 2020 and 2024, no version of § 200.340 authorizes an agency to terminate an award on the basis that it no longer effectuates agency priorities **unless** that basis is expressly stated in the terms and conditions of the award. And no version of the Uniform Guidance authorizes an agency to terminate an award merely because the agency's priorities shifted during the performance period for the award.

96.     OMB first promulgated the termination provision in 2020. In the preamble to the 2020 Uniform Guidance, OMB made clear that § 200.340(a)(2) granted federal agencies limited authority to terminate grants. It explained that awarding agencies "must clearly and unambiguously articulate the conditions under which [an ]award may be terminated in their applicable regulations **and** in the terms and conditions of [the] awards." 85 Fed. Reg. at 49507 (emphasis added); *see also id.* at 49542 (explaining again that an agency must in the award "make recipients aware, in a clear and unambiguous manner, of the termination provisions in § 200.340, including the applicable termination provisions in the [] awarding agency's regulations or in each [] award.")

97.     OMB further explained that the intent of § 200.340(a)(2) was to allow agencies to terminate awards where, for instance, "additional evidence reveals that a specific award objective is ineffective at achieving program goals," or where "additional evidence . . . cause[s] the [] awarding agency to significantly question the feasibility of the intended objective of the award." *Id.* at 49507-08. OMB also emphasized that § 200.340(a)(2) was "***linked to performance goals of the program*** (§ 200.301)." *Id.* at 49507. Program goals and objectives are established

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507                                    22                    ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1  during the program planning and design. 2 C.F.R. § 200.301. This is consistent with OMB's

2  stated intent that awarding agencies "prioritize ongoing support to [] awards that meet program

3  goals" 85 Fed. Reg. at 49507, which are goals and objectives established during the program

4  planning and design. 2 C.F.R. § 200.301. Termination pursuant to § 200.340(a)(2) therefore

5  cannot include instances in which the agency later decides to change priorities.

6       98.    Indeed, in response to comments expressing concern that § 200.340(a)(2) could

7  allow agencies to "arbitrarily terminate awards without sufficient cause," OMB made clear that

8  "as written, agencies are not able to terminate grants arbitrarily." 85 Fed. Reg. at 49509.

9       99.    When OMB amended the Uniform Guidance in 2024, it reiterated the meaning

10  of the relevant termination provision. OMB made explicitly clear that neither the new provision,

11  now at 2 C.F.R. § 200.340(a)(4), nor the prior version of the provision gives agencies unfettered

12  discretion to unilaterally terminate awards. Rather, "[t]he new paragraph (a)(4) *continues* to

13  provide that a [an] award may be terminated by the [] agency . . . pursuant to the terms and

14  conditions of the [] Award." 89 Fed. Reg. at 30089 (emphasis added).

15       100.    In other words, agencies may terminate an award that "no longer effectuates the

16  program goals or agency priorities," the award was originally intended to advance "[p]rovided

17  that the language *is included in the terms and condition of the award*." *Id.* (emphasis added).

18       101.    OMB could not have made this clearer, stating: "The revised version of paragraph

19  (a)(4) also explains that this may include a term and condition allowing termination by the

20  [agency], to the extent authorized by law, if an award no longer effectuates the program goals or

21  agency priorities." *Id.*

22       102.    This is consistent with 2 C.F.R. § 200.340(b), which OMB describes as

23  "underscoring the need for agencies . . . to clearly and unambiguously communicate termination

24  conditions in the terms and conditions of the award." *Id.*; *see* 2 C.F.R. § 200.340(b) ("The []

25  agency . . . must clearly and unambiguously specify all termination provisions in the terms and

26  conditions of the [] award.").

COMPLAINT FOR DECLARATORY AND        23
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1    103.    OMB revised the relevant provision not to effect a substantive change, but to

2    avoid any doubt as to its meaning.

3    104.    The Uniform Guidance also requires agencies to provide an opportunity to object

4    and provide information challenging terminations, in accordance with written processes and

5    procedures maintained by the agency. 2 C.F.R. § 200.342.[34]

6    **_Defendants May 5th Termination Notices_**

7    105.    On May 5, 2025, SBCTC and Ecology each received a letter, signed by Timothy

8    Carrigan, the Acting Director for NOAA's Grants Management Division, notifying them that

9    Defendants would cease funding, effective immediately, the Equitable Framework for Coastal

10    Resilience and Tribal Stewards awards, respectively.

11    106.    Each notice vaguely references "efforts to streamline and reduce the cost and

12    size" of the federal government and obliquely refers to agency and administration "goals,"

13    "objectives," and "priorities" but fails to affirmatively identify or adequately explain those **_new_**

14    goals, objectives, and priorities.

15    107.    In the Equitable Framework for Coastal Resilience termination notice, NOAA

16    added its conclusion that Ecology "proposes yet another layer of planning and outreach despite

17    the existence of several prior state- and federally-funded initiatives that already identified the

18    same needs [and a]dditional funding should go toward implementation, not repeated strategy

19    development."

20    108.    In the Tribal Stewards termination notice, NOAA added that its "priorities"

21    include "supporting outcome-based projects with clear deliverables, not projects with undefined

22    long-term    sustainability    or    effectiveness,    such    as    [Tribal    Stewards,]"    which    it

23    "concluded . . . lacks specific performance indicators, timelines, or mechanisms for evaluating

---

24    [34] The language of § 200.342 changed slightly in 2024. However, the policy was unchanged relative to
25    the proposed and prior versions. Both versions require agencies to provide administrative appeal rights to
     awardees and to maintain written procedures for processing objections, hearings, and appeals. 89 Fed. Reg. at
26    30090.

success."

109.    Even if these statements could constitute "agency priorities," and even if true—they are not—these statements do not support termination of the award pursuant to NOAA's cited bases.

110.    In each termination notice, NOAA expressly states it terminated the award because the award activities purportedly do not align with the Trump administration's ***new*** "priorities." NOAA's cited authority to terminate the awards, 2 C.F.R. § 200.340, authorizes NOAA to terminate an award that "no longer effectuates the program goals or agency priorities" the award was originally intended to advance if that basis for termination is "clearly and unambiguously" included in the terms and conditions of the award.

111.    However, no term or condition in the Equitable Framework for Coastal Resilience or Tribal Stewards awards authorizes NOAA to terminate the awards for failure to effectuate agency priorities and certainly not because the award activities are misaligned with the Trump administration's ***new*** priorities, which did not exist at the time the award was issued. Failure to effectuate the administration's ***new*** priorities, therefore, cannot provide a lawful basis for termination under § 200.340.

112.    Washington accepted the Equitable Framework for Coastal Resilience and Tribal Stewards awards with the understanding, consistent with the Uniform Guidance, that Defendants could not terminate either award if it "no longer effectuates the program goals or agency priorities" because that was not a basis for termination expressly included in the terms and conditions of the award. And even if the Agency had included such a term and condition, it still would not be authorized to terminate the awards as it has here—on a whim based on purported changes in agency priorities that post-date the award—let alone with no advance notice of the new priorities, no indication that Defendants considered Washington's significant investments of time and non-federal funds, and no opportunity to object or appeal.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

25

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1    **F.    The Termination of Its Awards Harms Washington**

2        113.    Defendants' unlawful termination of the Equitable Framework for Coastal

3    Resilience and Tribal Stewards awards will irreparably harm Washington.

4        114.    Termination of the Equitable Framework for Coastal Resilience award and illegal

5    withholding of approximately $114,000 in federal funds, nearly half the award amount,

6    terminates Ecology's Equitable Framework for Coastal Resilience work.

7        115.    By diverting other state funds, the CFS Management Section was able to pay its

8    consultant to provide a report of draft recommendations before Ecology was forced to terminate

9    the remainder of its work. However, the report was "finalized" without staff and inter-agency

10    partner review and feedback or additional opportunities for engagement with the affected

11    communities and tribes as planned, which renders the reports essentially unusable for the

12    intended purpose—to inform, among other things, SEHMP updates.

13        116.    Without the benefit of an updated plan and improved access to important State

14    resources, vulnerable coastal communities will continue to experience unmitigated adverse

15    effects from flooding, erosion, sea level rise, and other coastal hazards.

16        117.    At the time Defendants abruptly terminated Ecology's award, the ACRE Section

17    had issued a competitive recruitment process for a contractor to assess its current state; refine its

18    mission, vision, and strategic goals; create an implementation roadmap for advancing its

19    strategic goals; develop decision-making guidelines for accepting and rejecting requests for

20    assistance; and establish a framework for prioritization and scoping of ongoing work to ensure

21    equitable allocation of resources across Washington's vulnerable coastal communities. It had

22    selected a contractor and was finalizing a contract, who was scheduled to begin work as soon as

23    Ecology's Contracting Unit approved the contract.

24        118.    In the absence of Ecology's awarded and fully obligated funding, the ACRE

25    Section cannot finalize the contract, hire the contractor, or complete any of its planned Equitable

26    Framework for Coastal Resilience activities.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

119.     The newly formed ACRE Section also cannot develop a strategic plan to focus its resources on providing technical assistance and engineering solutions to Washington's vulnerable coastal communities and tribes. It cannot create an implementation roadmap for advancing its strategic goals. It cannot develop decision-making guidelines for accepting and rejecting requests for technical assistance or establish a framework for prioritization and scoping of ongoing work to ensure equitable allocation of resources.

120.     Without a clear mission, vision, and strategic roadmap, the ACRE Section's ability to deliver high-impact, science-based services to Washington's vulnerable communities will be less efficient and, ultimately, less effective. Lack of a strategic plan also risks duplication of efforts across Ecology sections and state agencies, which wastes funding and staff capacity that should be used to provide services to the public.

121.     Termination of Ecology's award impedes community access to the ACRE Section's technical assistance. Designed to serve communities facing severe coastal hazards— such as flooding, sea level rise, and erosion—that lack resources and technical capacity to address these threats on their own, Defendants' termination of Ecology's award disproportionately harms the Washington communities and populations most vulnerable to the adverse effects of climate change and coastal hazards. Without access to the ACRE Section's targeted technical assistance, these communities will remain exposed to worsening coastal hazards.

122.     Without an established framework for prioritizing technical assistance and project support across Washington's vulnerable coastal communities, Washington may unintentionally reinforce existing disparities and fail to equitably serve the communities most at risk from coastal hazards.

123.     There is no way to recover the substantial time and resources invested in developing Equitable Framework for Coastal Resilience, carrying out competitive contracting processes, and negotiating contracts, among other things, all of which are rendered meaningless

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507                                27                ATTORNEY GENERAL OF WASHINGTON
                                                                          Environmental Protection Division
                                                                          800 Fifth Avenue STE 2000
                                                                          Seattle, WA 98104
                                                                          (206) 464-7744

1  as a direct result of Defendants' termination of Ecology's award.

2  124.  Termination of the Tribal Stewards award and illegal withholding of

3  approximately $9 million in federal funds terminates Tribal Stewards.

4  125.  Without Tribal Stewards, the network of partnerships between Washington

5  colleges, up to 18 tribes, and other Washington employers will not be developed because

6  initiating, developing, and maintaining those partnerships requires dedicated staff whose salaries

7  rely on the federal funding Defendants arbitrarily terminated.

8  126.  The importance of the relationships that will no longer be established through

9  Tribal Stewards cannot be overstated. While the program initially leveraged some existing

10  partnerships, this significant network of new tribes, community and four-year colleges, and

11  employers cannot be established and maintained in the absence of the promised federal funding.

12  127.  Partnerships would have outlined cost sharing for student support and

13  scholarships, data sharing, coordinated recruitment efforts, employer commitments, work-based

14  learning agreements, and K-12 articulation agreements for credit transfer or dual enrollment, all

15  of which would have served workforce and educational attainment goals for Washington tribes

16  and resulted in economic development in some of Washington's most rural and economically

17  depressed regions.

18  128.  Without the funding awarded and fully obligated to SBCTC, Tribal Stewards

19  cannot fund the 25 planned employment positions necessary for program operation, including

20  providing customized support for students and integrating work-based learning experiences so

21  all students can build their professional work experience while in school. Eight existing

22  employees are also affected by the termination of Tribal Stewards, including the elimination of

23  three specialized leadership positions. The employees filling these positions were terminated or

24  reassigned.

25  129.  The abrupt and unlawful termination of funding for Tribal Stewards will make it

26  more difficult to recruit and retain qualified staff to fill positions in the future.

130.    Without staff, the program cannot support the approximately 553 students Tribal Stewards expected to graduate from the program, including the anticipated 145 tribal graduates. Without the customized support Tribal Stewards would have provided, research and history have demonstrated that these students will not or complete degree programs due to the multitude of persistent, structural barriers these communities face.

131.    Without staff and funding to support faculty professional development opportunities, such as the yearlong faculty learning community training and curriculum development work Tribal Stewards planned to provide, student educational outcomes resulting from improved instruction will not occur, which will negatively affect the quality of education and career development for currently enrolled students.

132.    There is known workforce demand for natural resources jobs in Washington, especially in the rural areas and tribal communities that Tribal Stewards would have served. Tribal Stewards graduates would have filled positions supporting economic development in some of Washington's most economically depressed regions. Because the same areas are also at significantly higher risk of experiencing the adverse effects of climate change, they are also most likely to benefit from natural resources staff trained and adept in implementing climate resilience-focused natural resource management, adaptation, and mitigation. In the absence of federal funding for Tribal Stewards, the benefits of staff trained in these areas will not accrue.

133.    Recognizing the importance of tribal sovereignty and self-determination in responding to the challenges posed by climate change, Tribal Stewards prioritized  the integration of tribal knowledge systems and community values into climate resilience strategies. The termination of Tribal Stewards funding interferes with Washington's ability to rely on tribal knowledge in developing and carrying out its Climate Resilience Strategy and therefore harms Washington.

134.    Tribal relations depend on credibility established through good relationships and reciprocity. Termination of Tribal Stewards results in catastrophic and irreparable reputation

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF NO. 2:25-cv-1507

29

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1    damage, and practically, reduced likelihood that tribes, and also colleges and non-tribal

2    employers, will want to partner with SBCTC in the future.

3         135.    There is no way to recover the substantial time and resources invested in, among

4    other things, developing Tribal Stewards; building a network of tribes, colleges, and employers;

5    and hiring and training specialized staff, all of which will be rendered meaningless as a direct

6    result of Defendants' termination of SBCTC's award. Nor is there any way to cure the damage

7    to SBCTC's reputation.

8         136.    In the absence of judicial relief, Washington will continue to suffer irreparable

9    harm on an ongoing basis that will only increase with time.

10
                                **CAUSES OF ACTION**
11

12                                    **COUNT 1**
                             **Termination of All Awards**
                **Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
13            **Not in Accordance with Law – Violation of Uniform Guidance**

14        137.    Plaintiff realleges and incorporates by reference the allegations contained in each

15    of the preceding paragraphs as if fully set forth herein.

16        138.    Under the APA, a court shall hold unlawful and set aside agency action, findings,

17    and conclusions that are "not in accordance with the law." 5 U.S.C. § 706(2)(A).

18        139.    Commerce and NOAA are each an "agency" as defined in the APA, 5 U.S.C.

19    § 551(1), and the termination of each of Washington's climate resilience awards constitutes a

20    final agency action subject to review under the APA.

21        140.    Executive agencies must follow the laws that govern their conduct and may not

22    engage in conduct that violates the law.

23        141.    An agency may terminate an award "pursuant to the terms and conditions of the

24    [] award, including, to the extent authorized by law, if an award no longer effectuates the

25

26

1  program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). [35]

2      142.    An agency's authority to terminate an award pursuant to 2 C.F.R. § 200.340(a)(4)

3  is not without limit.

4      143.    The termination of an award because it "no longer effectuates the program goals

5  or agency priorities" must be made "pursuant to the terms and conditions of the [] award" and

6  must be "authorized by law." *Id.*

7      144.    2 C.F.R. § 200.340(b) expressly provides that the agency "must clearly and

8  unambiguously specify all termination provisions in the terms and conditions of the [] award."

9  2 C.F.R. § 200.340(b).

10      145.    Neither of Washington's awards contained terms or conditions that authorize

11  termination on the basis that the award "no longer effectuates the program goals or agency

12  priorities."

13      146.    Defendants purported to terminate Washington's awards because they are

14  inconsistent with the Trump administration's ***new*** priorities. Even assuming the awards

15  contained an express provision authorizing termination on the basis that the award "no longer

16  effectuates the program goals or agency priorities," the Uniform Guidance does not authorize

17  termination for failure to effectuate ***new*** priorities established during the pendency of an award.

18      147.    Accordingly, Defendants' termination of each of Washington's climate resilience

19  awards is not in accordance with law and must be held unlawful and set aside under the APA.

20      148.    Washington is an aggrieved persons suffering a legal wrong or is adversely

21  affected by the federal Defendants' conduct under 5 U.S.C. § 702 and is entitled to declaratory

22

23      [35] Defendants purport to terminate the Equitable Framework for Coastal Resilience awards pursuant to 2
24  C.F.R. § 200.340(a)(2) (2021), the prior version of the Uniform Guidance, which provides that an agency may
     terminate an award "to the greatest extent authorized by law, if an award no longer effectuates the program goals
     or agency priorities." The difference in language between 2 C.F.R. § 200.340(a)(2) (2020) and 2 C.F.R.
25  § 200.340(a)(4) is not legally significant. *See supra* ¶¶96-107. Thus, Plaintiff's references in this cause of action
     to 2 C.F.R. § 200.340(a)(4) include Defendants' reliance on 2 C.F.R. § 200.340(a)(2) (2020) to terminate
26  Ecology's awards.

and injunctive relief pursuant to 28 U.S.C. § 2201.

## COUNT 2
### Termination of All Awards
### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Without Observance of Procedure Required by Law – Violation of the Uniform Guidance

149.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

150.    Under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions that are "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

151.    Commerce and NOAA are each an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the termination of each of Washington's climate resilience awards constitutes a final agency action subject to review under the APA.

152.    Executive agencies must follow the laws that govern their conduct and may not engage in conduct that violates the law.

153.    Judicial review of an agency's procedural compliance is "exacting." *See Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).

154.    Under 2 C.F.R. § 200.342, Defendants are required to "maintain written procedures for processing objections, hearings, and appeals" and provide the awardee with "an opportunity to object and provide information challenging the action."[36]

155.    Defendants failed to maintain written procedures for processing objections, hearings, and appeals.

156.    Defendants also failed to provide Washington any opportunity to object or provide information challenging the termination of their awards and affirmatively denied Washington's right to appeal. When SBCTC attempted to object, as authorized under 2 C.F.R. § 200.342, NOAA summarily informed it the termination was not subject to appeal.

---

[36] *See supra* n.29.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

157.    Accordingly, Defendants terminated Washington's awards without observance of procedure required by law and the termination is therefore unlawful and must set aside under the APA.

158.    Washington is an aggrieved persons suffering a legal wrong or is adversely affected by the federal Defendants' conduct under 5 U.S.C. § 702 and is entitled to declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

**COUNT 3**
**Termination of Equitable Framework for Coastal Resilience Award**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious – Failure to Engage in Reasoned-Decision-Making**

159.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

160.    Under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

161.    Commerce and NOAA are each an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the termination of the Equitable Framework for Coastal Resilience award constitutes a final agency action subject to review under the APA.

162.    Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. Environmental Protection Agency*, 603 U.S. 279, 292 (2024). In reviewing an agency's action under that standard, a court may not "substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009), but it must ensure, among other things, that the agency has offered "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

163.    Agency action is also arbitrary and capricious if the agency "relied on factors

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

33

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

164.    If an agency action reflects a changed position and the agency fails to "provide a reasoned explanation for the change, display awareness that [it is] changing position, and consider serious reliance interests," its action is arbitrary and capricious. *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025) (internal quotation marks omitted).

165.    Defendants' termination of the Equitable Framework for Coastal Resilience award is arbitrary and capricious for at least six reasons.

166.    First, Defendants relied on factors Congress did not intend for them to consider. In the Equitable Framework for Coastal Resilience termination notice, Defendants stated that "[a]s part of efforts to streamline and reduce the cost and size of the Federal Government, the Department is reprioritizing funding and staff to support only those activities directly related to its current programmatic goals and mission priorities." Congress did not intend for Defendants to consider the cost and size of government in decisions to terminate awards that are carrying out the precise purpose of the authorizing statute. Ecology's Equitable Framework for Coastal Resilience fulfilled the objectives of CZMA Section 309 and was a Project of Special Merit intended to further Washington's approved enhancement area strategies and the national enhancement priority of coastal hazards as solicited in the 2023 NOFO.

167.    Second, Defendants assert that Equitable Framework for Coastal Resilience is "no longer aligned with effectuating [current programmatic goals and mission priorities], nor relevant to the current focus of the Administration's objectives." Defendants failed to identify the "programmatic goals," "mission priorities," "factors of the Administration's objectives," or "Administration objectives" with which Equitable Framework for Coastal Resilience is purportedly misaligned. In turn, Defendants failed to provide any rational connection between

the facts and Defendants' assertion that Equitable Framework for Coastal Resilience "no longer effectuates" these unidentified priorities. Where an awardee cannot identify the basis for termination of its award, the termination decision is arbitrary and capricious.

168.    Third, Defendants did not—and could not—provide any rational basis for their sole conclusion: that Equitable Framework for Coastal Resilience "proposes yet another layer of planning and outreach despite the existence of several prior state- and federally-funded initiatives that already identified the same needs." No state or federally funded initiatives to date have addressed the specific scope of work proposed by Equitable Framework for Coastal Resilience. Ecology's work, which included a strategic planning effort uniquely focused on developing an equity-centered framework for the newly formed ACRE Section, and as NOAA previously acknowledged, is both novel and necessary to ensure that Ecology can effectively and equitably serve Washington's coastal communities and tribes moving forward.

169.    Fourth, to the extent Defendants determined that Equitable Framework for Coastal Resilience "no longer effectuate program goals or agency priorities," that determination runs so counter to the evidence before them it is entirely implausible that their conclusions could be ascribed to a difference in view. Ecology's Equitable Framework for Coastal Resilience fulfilled the objective of the assistance authorized under Section 309 of the CZMA to encourage states with a federally approved coastal management program to continually improve its program with respect to specified areas of national importance. Equitable Framework for Coastal Resilience falls squarely within one of the "areas of national importance" designated in the 2023 NOFO: coastal hazards. Although the areas of national importance relevant to Defendants' decision are those in place at the time the funding was awarded to Ecology, a look at the areas of national importance designated in NOAA's CZMA Section 309 Program Guidance for the 2026-2030 cycle belies the pretextual nature of Defendants' action. Published in February 2025, the guidance makes clear that coastal hazards remains an area of national importance on which funding for projects of special merit "will be focused."

170.    Fifth, to the extent Defendants determined that Equitable Framework for Coastal Resilience "no longer effectuate program goals or agency priorities," Defendants' determination, along with the termination of the award, represents a significant change in agency position. Defendants must demonstrate that there are good reasons for their change in position. However, the only reason the Defendants provided for their change in position is the change in position itself. This circular reasoning is inadequate under the APA. Defendants' termination arbitrarily rests on an unreasonable and unexplained change in Defendants' interpretation of § 200.340 and is contrary to the longstanding principle that agencies cannot terminate awards arbitrarily based on changes in agency priorities that post-date issuance of the award.

171.    Sixth, Defendants failed to consider Ecology's serious relance interests. Ecology acted in reasonable reliance that SBCTC would receive the full amount of its fully obligated award.

172.    For these six independently sufficient reasons, Defendants' termination of the Equitable Framework for Coastal Resilience award should be held unlawful and set aside under the APA.

173.    Washington is an aggrieved persons suffering a legal wrong or is adversely affected by the federal Defendants' conduct under 5 U.S.C. § 702 and is entitled to declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

**COUNT 4**
**Termination of Tribal Stewards Awards**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious – Failure to Engage in Reasoned Decision-Making**

174.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

175.    Under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

176.    Commerce and NOAA are each an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the termination of the Tribal Stewards award constitutes a final agency action subject to review under the APA.

177.    Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA* at 292. In reviewing an agency's action under that standard, a court may not "substitute its judgment for that of the agency," *FCC v. Fox Television* at 513, but it must ensure, among other things, that the agency has offered "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn.* at 43 (internal quotation marks omitted).

178.    Agency action is also arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

179.    If an agency action reflects a changed position and the agency fails to "provide a reasoned explanation for the change, display awareness that [it is] changing position, and consider serious reliance interests," its action is arbitrary and capricious. *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025) (internal quotation marks omitted).

180.    Defendants' termination of the Tribal Stewards award is arbitrary and capricious for at least five reasons.

181.    First, Defendants relied on factors Congress did not intend for them to consider. In the Tribal Stewards termination notice, Defendants assert that "[a]s part of efforts to streamline and reduce the cost and size of the Federal Government, the Department is reprioritizing funding and staff to support only those activities directly related to its current programmatic goals and mission priorities." Congress did not intend for Defendants to consider the cost and size of government in decisions to terminate awards supporting projects funded by

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

37

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

the $2.6 million it appropriated through the IRA to invest in coastal communities and climate resilience by providing funding to coastal states, Tribal Governments, and institutions of higher education or the $6 million appropriated through the National College Sea Grant Act to fund priority activities, including ''University research, education, training, and extension services and activities focused on coastal resilience." 134 Stat. at 1060; 33 U.S.C. 1131(a)(2)(D).

182.    Second, Defendants assert that Tribal Stewards is "no longer aligned with effectuating [current programmatic goals and mission priorities], nor relevant to the current focus of the Administration's objectives." Defendants failed to identify the "programmatic goals," "mission priorities," "factors of the Administration's objectives," or "Administration objectives" with which Tribal Stewards is purportedly misaligned. In turn, Defendants failed to provide any rational connection between the facts and Defendants' conclusion that Tribal Stewards "no longer effectuates" these unidentified priorities. Where an awardee cannot identify the basis for termination of its award, the termination decision is arbitrary and capricious.

183.    Third, Defendants did not—and could not—provide any rational basis for their conclusion that Tribal Stewards "lacks specific performance indicators, timelines, or mechanisms for evaluating success" because Tribal Stewards provides concrete performance indicators, timelines and mechanisms for measuring success. SBCTC has demonstrated that Tribal Stewards is an outcome-based project with clear objectives and deliverables. Defendants' conclusions that Tribal Stewards lacks specific performance indicators, timelines, or mechanisms for evaluating success run so counter to the evidence before them it is entirely implausible that their conclusions could be ascribed to a difference in view.

184.    Fourth, to the extent Defendants determined that Tribal Stewards "no longer effectuates program goals or agency priorities" that determination, along with their termination of the award, represents a significant change in agency position. Defendants must demonstrate that there are good reasons for their change in position. However, the only reason the Defendants provided for their change in position is the change in position itself. This circular reasoning is

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1   inadequate under the APA. Defendants' termination arbitrarily rests on an unreasonable and

2   unexplained change in Defendants' interpretation of § 200.340 and is contrary to the

3   longstanding principle that agencies cannot terminate awards arbitrarily based on changes in

4   agency priorities that post-date issuance of the award.

5       185.    Fifth, Defendants failed to consider the serious relance interests of SBCTC and

6   Tribal Stewards partners, including Washington colleges and tribal governments. SBCTC and

7   its partners acted in reasonable reliance that SBCTC would receive the full amount of its fully

8   obligated award.

9       186.    For each of these independently sufficient reasons, Defendants' termination of

10  the Tribal Stewards award agreement must be held unlawful and set aside under the APA.

11      187.    Washington is an aggrieved persons suffering a legal wrong or is adversely

12  affected by the federal Defendants' conduct under 5 U.S.C. § 702 and is entitled to declaratory

13  and injunctive relief pursuant to 28 U.S.C. § 2201.

**COUNT 5**
**All Terminations**
**Violation of the U.S. Constitution Appointments Clause**

16      188.    Plaintiff realleges and incorporates by reference the allegations contained in each

17  of the preceding paragraphs as if fully set forth herein.

18      189.    On information and belief, neither a NOAA nor Commerce employee determined

19  that Washington's awards should be terminated.

20      190.    A non-NOAA employee cannot lawfully make these determinations on behalf of

21  NOAA without violating the Appointments Clause. *Edmond v. United States*, 520 U.S. 651, 659

22  (1997).

23      191.    Federal courts possess the power in equity to grant injunctive relief "with respect

24  to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575

25  U.S. 320, 327 (2015). Washington is "entitled to invoke the equitable jurisdiction to restrain

26  enforcement" of unconstitutional acts by federal officials. *Panama Refin. Co. v. Ryan*, 293 U.S.

388, 414 (1935).

192.    Pursuant to 28 U.S.C. § 2201, Washington is entitled to a declaration that Defendants' actions violate the Appointments Clause and are therefore unconstitutional.

193.    Washington is also entitled to a permanent injunction preventing Defendants from implementing, maintaining, or reinstating their termination decisions.

**COUNT 6**
**All Terminations**
**Violations of the U.S. Constitution Spending Clause**

194.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

195.    The Spending Clause requires States to have fair notice of the conditions that apply to the disbursement of funds to them. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18, 25 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012). Funding conditions must be set out "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). This requirement flows from the Spending Clause principle that States must "voluntarily and knowingly" accept conditions attached to federal spending. *Id.* at 296 (quoting *Pennhurst*, 451 U.S. at 17). States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17). The requirement of unambiguous conditions "enable[s] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17.

196.    Terminating Washington's awards under the purported basis that they do not effectuate policies and priorities not known to Washington nor included in the terms and conditions of the agreements under which the funding was awarded contravenes the Spending Clause. Moreover, even if Defendants had clearly identified in the termination notices the new priorities Washington has purportedly failed to effectuate—they did not—the State could not possibly comply with priorities unknown to it at the time of the terminations, nor should it have

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

40

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

to.

197.    Washington designed its proposals and applications for funding to achieve the statutory purposes of the funding sources and the specific goals and priorities announced in the NOFOs. Defendants' terminations amount to a retroactive application of new and unknown conditions on Washington's awards and Defendants now assert authority to unilaterally terminate Washington's awards on the basis of these new conditions alone. Washington had no notice of these conditions nor the opportunity to "voluntarily and knowingly" accept them as conditions attached to its awards of funding from NOAA.

198.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Exceptional Child Ctr., Inc.*, 575 U.S. at 327. Washington is "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials. *Panama Refin. Co.*, 293 U.S. at 414.

199.    Pursuant to 28 U.S.C. § 2201, Washington is entitled to a declaration that Defendants' actions violate the Spending Clause and are therefore unconstitutional.

200.    Washington is also entitled to a permanent injunction preventing Defendants from implementing, maintaining, or reinstating their termination decisions.

## COUNT 7
### All Terminations
### Violations of the U.S. Constitution Separation of Powers Doctrine

201.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

202.    The Constitution empowers Congress to make laws, U.S. Const. art. 1, § 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* art. II, § 3.

203.    Consistent with the structural and functional separation-of-powers on which our system of government is based, and on which it depends, "Congress makes laws and the President . . . faithfullyexecutes them." *Util. Air Regul. Grp. v. Env't. Prot. Agency*, 573 U.S. 302, 327 (2014) (cleaned up).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO. 2:25-cv-1507

41

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1    204.    "The Framers viewed the legislative power as a special threat to individual

2    liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of

3    parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'"

4    *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist

5    No. 70, at 475 (Alexander Hamilton) & No. 51, at 350 (James Madison)).

6    205.    Thus "'important subjects . . . must be entirely regulated by the legislature itself,'

7    even if Congress may leave the Executive 'to act under such general provisions to fill up the

8    details.'" *W. Va v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (alteration in

9    original) (quoting *Wayman v. Southard*, 23 U.S. 1, 42-43 (1825)).

10    206.    The separation-of-powers doctrine thus represents a central tenet of our

11    Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *Seila Law LLC*,

12    591 U.S. at 227. Consistent with these principles, the Executive acts at the lowest ebb of his

13    constitutional authority and power when he acts contrary to the express or implied will of

14    Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

15    concurring). The Executive's powers are limited to those specifically conferred by the

16    Constitution and federal statutes, and do not include any undefined residual or inherent power.

17    207.    The faithfulness the Constitution requires of the Executive is not to the

18    President's views on priorities, but to the laws enacted by Congress as interpreted and enforced

19    by the Courts. Congress's powers to set the policies of the nation are at their apex when it comes

20    to spending money, as the Constitution "exclusively grants the power of the purse to Congress,

21    not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

22    208.    The executive branch has no constitutional authority to refuse to carry out laws

23    enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay

24    spending appropriations based on the President's own preferences. The executive branch violates

25    the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by

26    Congress and signed into law or duly promulgated regulations implementing such statutes. *See*

COMPLAINT FOR DECLARATORY AND          42          ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE RELIEF                                   Environmental Protection Division
NO. 2:25-cv-1507                                    800 Fifth Avenue STE 2000
                                                    Seattle, WA 98104
                                                    (206) 464-7744

1    *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he

2    President is without authority to set aside congressional legislation by executive order . . . .");

3    *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838) (rejecting argument that by

4    charging the President with faithful execution of the laws, the Take Care clause "implies a power

5    to forbid their execution"); *see also Util. Air. Regul. Grp.*, 573 U.S. at 327 (noting that the

6    President "act[s] at time[] through agencies").

7        209.    No statute or regulation authorizes the executive branch's actions here. Congress

8    provided funding to NOAA through enactment of the IRA specifically "to provide funding

9    through direct expenditure, contracts, grants, cooperative agreements, or technical assistance to

10   coastal states . . . , Tribal Governments, . . . and institutions of higher education . . . , for the

11   conservation, restoration, and protection of coastal and marine habitats, . . . to enable coastal

12   communities to prepare for extreme storms and other changing climate conditions, and for

13   projects that support natural resources that sustain coastal and marine resource dependent

14   communities." Congress created and funded the National Sea Grant College Program to promote

15   research, education, training, and advisory service activities to increase understanding,

16   assessment, development, utilization, and conservation of the Nation's ocean, coastal, and Great

17   Lakes resources.

18       210.    Congress created and funded the CZMA Section 309 Coastal Zone Enhancements

19   Grant Program to provide funding to states for proposals that will result in coastal management

20   program changes in one or more of nine enhancement areas, including coastal hazards.

21       211.    In terminating Washington's awards on the basis of their own priorities without

22   regard for statutory directive, congressional intent, and applicable regulations, Defendants

23   violate the Take Care Clause, override the careful judgments of Congress, and impermissibly

24   arrogate to the executive branch legislative and spending powers reserved to Congress.

25       212.    Federal courts possess the power in equity to grant injunctive relief "with respect

26   to violations of federal law by federal officials." *Exceptional Child Ctr., Inc.*, 575 U.S. at 327.

COMPLAINT FOR DECLARATORY AND          43        ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE RELIEF                                           Environmental Protection Division
NO. 2:25-cv-1507                                            800 Fifth Avenue STE 2000
                                                           Seattle, WA 98104
                                                           (206) 464-7744

1    Washington is "entitled to invoke the equitable jurisdiction to restrain enforcement" of

2    unconstitutional acts by federal officials. *Panama Refin. Co.*, 293 U.S. at 414.

3        213.    Pursuant to 28 U.S.C. § 2201, Washington is entitled to a declaration that

4    Defendants' actions violate the separation-of-powers doctrine and are therefore unconstitutional.

5        214.    Washington is also entitled to a permanent injunction preventing Defendants

6    from implementing, maintaining, or reinstating their termination decisions.

7
                                    **COUNT 8**
                                 **All Terminations**
8                                **Equitable Ultra Vires**
                     **Conduct outside the Scope of Authority**
9
        215.    Plaintiff realleges and incorporates by reference the allegations contained in each
10
     of the preceding paragraphs as if fully set forth herein.
11
        216.    Any Agency and its executive officers may exercise only the authority conferred
12
     by statute and regulations.
13
        217.    Washington has a non-statutory right of action to have action taken in excess of
14
     legal authority declared unlawful.
15
        218.    A court reviewing executive action has an independent duty to determine what
16
     the law is and whether executive officers invoking statutory authority exceed their statutory
17
     power. *Exceptional Child Ctr., Inc.*, 575 U.S. at 327.
18
        219.    Defendants do not have authority to terminate Washington's awards based on
19
     purported misalignment with ***new*** priorities that post-date the original award.
20
        220.    Defendants' terminations without regard to the authorizing statutes, the Uniform
21
     Guidance, and NOAA regulations are contrary to law and exceed Defendants' authority.
22
        221.    To the extent a non-NOAA employee made the determinations to terminate
23
     Washington's awards, Defendants' terminations violate the Appointments Clause and are
24
     therefore *ultra vires*.
25
        222.    To the extent Defendants' terminations relied on placing new, unidentified or
26

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

ambiguous, and retroactive conditions on Washington's awards, Defendants have encroached on Congress's Spending Clause authority and violated the separation-of-powers and thereby acted *ultra vires*.

223.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Exceptional Child Ctr., Inc.*, 575 U.S. at 327. Washington is "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials. *Panama Refin. Co.*, 293 U.S. at 414.

224.    Pursuant to 28 U.S.C. § 2201, Washington is entitled to a declaration that Defendants' decisions to terminate their awards and federal funding are *ultra vires* and therefore unlawful.

225.    Washington is also entitled to a permanent injunction preventing Defendants from implementing, maintaining, or reinstating their termination decisions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Washington prays that the Court:

a.    Declare that Defendants' terminations of Washington's Equitable Framework for Coastal Resilience and Tribal Stewards awards are unlawful under the APA.

b.    Declare that Defendants' terminations of Washington's Equitable Framework for Coastal Resilience and Tribal Stewards awards violate the U.S. Constitution.

c.    Vacate Defendants' terminations of Washington's Equitable Framework for Coastal Resilience and Tribal Stewards awards and restore the awards.

d.    Permanently enjoin Defendants from terminating Washington's Equitable Framework for Coastal Resilience and Tribal Stewards awards, except in accordance with the requirements set forth in the Uniform Guidance and the express terms and conditions of each award.

e.    Permanently enjoin Defendants from impeding access to the full amount of funds awarded to Washington through the Equitable Framework for Coastal Resilience

1    and Tribal Stewards awards, except in accordance with the law, and require

2    Defendants to provide any extensions necessary to ensure the work funded

3    through the cooperative agreements can be completed.

4    f.    Retain jurisdiction to ensure compliance with the orders of this Court.

5    g.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

6    fees, pursuant to 28 U.S.C. § 2412; and

7    h.    Grant other such relief as this Court may deem proper.

8

9    DATED this 8th day of August, 2025.

10    **NICHOLAS W. BROWN**
Attorney General

11

12    *s/ Caitlin M. Soden*

13    CAITLIN M. SODEN, WSBA #55457
LEAH A. BROWN, WSBA #45803
ELLEN RANGE, WSBA #51334

14    Assistant Attorneys General
800 Fifth Avenue, Suite 2000

15    Seattle, Washington 98104
(206) 464-7744

16    caitlin.soden@atg.wa.gov
leah.brown@atg.wa.gov

17    ellen.range@atg.wa.gov

18    *Attorneys for the State of Washington*

19

20

21

22

23

24

25

26

COMPLAINT FOR DECLARATORY AND          46                    ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE RELIEF                                           Environmental Protection Division
NO. 2:25-cv-1507                                            800 Fifth Avenue STE 2000
                                                            Seattle, WA 98104
                                                            (206) 464-7744