

1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT
                                    WESTERN DISTRICT OF WASHINGTON
9                                            AT SEATTLE

10       STATE OF WASHINGTON,                    CASE NO. C25-1507 MJP

11                        Plaintiff,             ORDER GRANTING MOTION FOR
                                                 PRELIMINARY INJUNCTION
12              v.

13       U.S. DEPARTMENT OF
         COMMERCE; HOWARD LUTNICK;
14       NATIONAL OCEANIC AND
         ATMOSPHERIC ADMINISTRATION;
15       and LAURA GRIMM,

16                        Defendants.

17

18             This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction.

19      (Dkt. No. 6.) Having reviewed the Motion, Defendants' Opposition (Dkt. No. 23), the Reply

20      (Dkt. No. 25), and all supporting materials, the Court GRANTS the Motion and issues the

21      Preliminary Injunction as outlined in the Conclusion, below. The Court finds this matter suitable

22      for determination without oral argument, as Defendants have been given notice and an

23

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 1

1    opportunity to be heard, the Parties have provided robust briefing, and counsel for Defendants

2    has been furloughed and is unavailable for a hearing.

3                                    **BACKGROUND**

4            The State of Washington challenges the termination of over $9 million in two cooperative

5    agreements that the Department of Commerce and the National Oceanic and Atmospheric

6    Administration issued in 2023 and 2024 to "help [Washington] communities disproportionately

7    exposed to the adverse effects of climate change become more resilient." (Complaint ¶ 3 (Dkt.

8    No. 1).) Washington claims that the termination of the two cooperative agreements (the

9    "Awards") was arbitrary and capricious, ultra vires, and unconstitutional. It has filed suit against

10   the Department of Commerce and its Secretary, Howard Lutnik, as well as the NOAA and its

11   Acting Administrator, Laura Grimm. The Court reviews the two Awards, the relevant facts

12   surrounding the terminations, and the regulatory framework.

13   **A.    NOAA Awards**

14           In 2022 and 2023, "Washington applied for and received federal funding for two

15   proposals to strengthen Washington's climate resilience with a focus on disproportionately

16   affected communities." (Compl. ¶ 36.) "NOAA awarded Washington funding for (a) the

17   Washington State Department of Ecology's Advancing an Equitable Framework for Coastal

18   Resilience in Washington State, a Coastal Zone Management Project of Special Merit funded by

19   the Coastal Zone Management Act, and (b) the Washington State Board of Community and

20   Technical Colleges' Tribal Stewards: Cultivating Tribal Leadership & Equity in Natural

21   Resource Stewardship & Climate Resilience, a Climate Ready Workforce Initiative project

22   funded by the Inflation Reduction Act and National Sea Grant College Act." (Id.) The Court

23   refers to the first award as the EFCR Award and the second as the Tribal Stewards Award.

24

1    In 2023, the Department of Commerce approved the $250,000 EFCR Award to the State

2    of Washington Department of Ecology as a "financial assistance award" marked as a

3    "cooperative agreement," not a "grant." (Ex. C to the Declaration of Michelle Gostic (Dkt. No.

4    7-3).) The Award explains that it "is a cooperative agreement as described in 2 C.F.R. § 200.1,

5    meaning that the NOAA is 'substantially involved' in the project" by providing technical

6    assistance and guidance and to "participate in programmatic activities beyond normal

7    stewardship responsibilities in the administration of the award." (Id. at 2-3.) In August 2024,

8    NOAA approved a no-cost extension of the Award, which again confirmed that this was a

9    cooperative agreement to run to the end of March 2026. (Gostic Decl. ¶ 15 & Ex. E.)

10    In 2024, the Department of Commerce and NOAA approved the Tribal Stewards Award

11    to the Washington State Board for Community and Technical Colleges (SBCTC) as a

12    "cooperative agreement" that was to run from August 2024 to the end of July 2028. (Ex. A to the

13    Declaration of Maya Esquivido (Dkt. No. 10-1).) The Award identified the "Federal Share of

14    Cost" as $9,257,231, and the recipient's costs as $0. (Id.) The Award specifically noted that it

15    was a "Cooperative Agreement . . . between" NOAA, the National Sea Grant Office, and

16    Washington SBCTC. (Id. at 7.) The Award document explains that "[t]he substantial

17    involvement between the Federal Agency and the recipient during performance of the activity

18    includes working with their Federal Program Officer in the National Sea Grant Office to

19    facilitate strategic engagement and project evaluation." (Id.)

20    **B.    Termination of the Awards**

21    On May 5, 2025, the Acting Director of NOAA Grants Management sent nearly identical

22    letters to the Department of Ecology and the Washington SBCTC to inform them that Commerce

23    was terminating the Awards "[a]s part of efforts to streamline and reduce the cost and size of the

24

Federal Government." (Esquivido Decl. Ex. E (Dkt. No. 10-5); Gostic Decl. Ex. F (Dkt. No. 7-6).) The letters explained that "the Department is reprioritizing funding and staff to support only those activities directly related to its current programmatic goals and mission priorities" and that the Awards "activities are no longer aligned with effectuating these undertakings, nor relevant to the current focus of the Administration's objectives." (Id.) As to the EFCR Award, the termination letter states that "NOAA has concluded that this project proposed yet another layer of planning and outreach despite the existence of several prior state- and federally-funded initiatives that already identified the same needs" and that "[a]dditional funding should go toward implementation, not repeated strategy development." (Dkt. No. 7-6.) As to the Tribal Stewards Award, the letter noted that "NOAA has concluded that though the program promises 'robust assessment' and dissemination of findings, it lacks specific performance indictors, timelines, or mechanisms for evaluating success," and that "NOAA priorities include supporting outcome-based projects with clear deliverables, not projects with undefined long-term sustainability or effectiveness, such as this." (Dkt. No. 10-5). Both letters terminated the Awards effective May 5, 2025, and noted that Commerce was invoking 2 C.F.R. § 200.340(a)(4) (2024) as to the Tribal Steward Award and 2 C.F.R. § 200.340(a)(2) (2021) as to the EFCR Award. (Dkt. Nos. 7-6 & 10-5.) This federal regulation states that a federal award may be terminated "By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

Washington notes that the termination of the Awards align with various Executive Orders targeting funding for diversity, equity, and inclusion (DEI), efforts to fight climate change, and environmental justice. In Executive Order 14151, President Trump "mandated agencies to,

1    among other things, provide to the Director of the U.S. Office of Management and Budget a list

2    of all 'grantees who received Federal funding to provide or advance DEI, DEIA, or

3    "environmental justice" programs, services, or activities since January 20, 2021,' and to

4    terminate all '"equity-related" grants.'" (Compl. ¶ 4 (quoting Exec. Order 14,151, 90 Fed. Reg.

5    8339, 8339-40 (Feb. 26, 2025).) Similarly, President Trump directed agencies to terminate

6    federal funding to reduce federal spending or "reallocate spending to . . . advance the policies of

7    [his] Administration." Exec. Order No. 14,222, 90 Fed. Reg. 11095, 11096 (Feb. 26, 2025). And

8    in "April 2025, the President took aim at states' attempts to address climate change within their

9    own borders, describing such efforts as 'burdensome and ideologically motivated' and going so

10   far as to direct the Attorney General of the United States to identify 'State laws purporting to

11   address "climate change" or involving "environmental, social, and governance" initiatives,

12   "environmental justice," carbon or "greenhouse gas" emissions' and take action to 'stop the

13   enforcement of [those] laws.'" (Compl. ¶ 6. (quoting Exec. Order No. 14,260, 90 Fed. Reg.

14   15513, 15514 (April 8, 2025)).)

15        As is relevant to the finality of this agency action, NOAA confirmed that it would not

16   accept an appeal of the termination decision of the Tribal Steward Award. (Esquivido Decl. Ex.

17   H (Dkt. No. 10-8).) There is no similar statement regarding the EFCR Award in the record.

18   **C.    Regulatory Framework**

19        The Awards are governed by OMB regulations, codified at 2 C.F.R. Part 200. See 2

20   C.F.R. § 1327.101. These regulations in force at the time the Awards were made stated that the

21   "Federal awarding agency should clearly and unambiguously specify termination provisions

22   applicable to each Federal award, in applicable regulations or in the award, consistent with this

23   section." 2 C.F.R. § 200.340(b) (2021). This is relevant to the fact that OMB general guidance

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 5

1    referenced in 2020 emphasizes that agencies should set priorities and establish goals and

2    objectives "before the applications are solicited." 85 Fed. Reg. at 49507; see also 2 C.F.R. §

3    200.202

4        NOAA invoked 2 C.F.R. § 200.340(a) as the basis for termination of the Awards. This

5    provision states that "The Federal award may be terminated in part or its entirety . . . (4) [b]y the

6    Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award,

7    including, to the extent authorized by law, if an award no longer effectuates the program goals or

8    agency priorities." 2 C.F.R. § 200.340(a)(4) (2024). OMB's Guidance issued with the 2024

9    amendments, noted that Section 200.340(a)(4) allows a federal award to "include a term and

10   condition allowing termination by the Federal agency or pass-through entity, to the extent

11   authorized by law, if an award no longer effectuates the program goals or agency priorities."

12   Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046-01, 30089 (Apr. 22, 2024). OMB

13   further explained that it "f[ound] the final version of the guidance provides greater clarity on the

14   policy for termination of awards by the Federal agency or pass-through entity by underscoring

15   the need for agencies and pass-through entities to clearly and unambiguously communicate

16   termination conditions in the terms and conditions of the award." Id.

17   **D.    Preliminary Injunction**

18       Washington has moved for a preliminary injunction to enjoin Defendants from

19   terminating the Awards and "impeding Washington's access to the full amount of funds

20   obligation to Washington through" the awards." (Proposed Order at 1-2 (Dkt. No. 6-1).)

21   Washington asks the Court to order Defendants to take every step to effectuate the injunction,

22   and to excuse Washington from posting a bond. (Id.)

23

24

1

**ANALYSIS**

2

**A.    Subject Matter Jurisdiction**

3

Defendants assert that the Court lacks subject matter jurisdiction because this case merely

4

presents a contractual dispute over which the Court of Federal Claims has exclusive jurisdiction

5

per the Tucker Act. The Court disagrees.

6

**1.    Applicable Law**

7

Washington asserts that the Court has jurisdiction under the Administrative Procedures

8

Act. The APA waives the United States' sovereign immunity and confers jurisdiction over

9

claims brought by a person adversely affected by final agency action. 5 U.S.C. §§ 702, 704.

10

"That waiver, however, is subject to three limitations: (1) the plaintiff must 'seek[ ] relief other

11

than money damages'; (2) the plaintiff must have 'no other adequate remedy'; and (3) the

12

plaintiff's action must not be 'expressly or impliedly forbid[den]' by 'any other statute.'" United

13

Aeronautical Corp. v. United States Air Force, 80 F.4th 1017, 1022 (9th Cir. 2023) (quoting 5

14

U.S.C. S §§ 702, 704 & citing Tucson Airport Auth. v. Gen. Dynamics Corp., 136 F.3d 641, 645

15

(9th Cir. 1998)). "Where a statute vests exclusive jurisdiction over a category of claims in a

16

specialized court (e.g., the Court of Federal Claims), it 'impliedly forbids' an APA action

17

brought in federal district court." Id. (citing Tucson, 136 F.3d at 646).

18

Defendants contend that the Tucker Act vests exclusive jurisdiction over Washington's

19

claims in the Court of Federal Claims because they are simply contractual claims disguised as

20

APA claims. The Tucker Act gives the Court of Federal Claims jurisdiction "to render judgment

21

upon any claim against the United States founded . . . upon any express or implied contract with

22

the United States." 28 U.S.C. § 1491(a)(1). "Because this statute 'grants consent to suit' and

23

'impliedly forbids' declaratory and injunctive relief, it precludes bringing contract claims against

24

1   the United States in federal district court pursuant to the APA's waiver of sovereign immunity."

2   Thakur v. Trump, 148 F.4th 1096, 1103 (9th Cir. 2025) (quoting 5 U.S.C. § 702 and citing

3   Tucson, 136 F.3d at 645–46). "In other words, for contract claims against the United States

4   seeking more than $10,000, the Tucker Act confers exclusive jurisdiction on the Court of Federal

5   Claims." Id.

6          But the Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and

7   declaratory relief only if that action is a 'disguised' breach-of-contract claim." United

8   Aeronautical, 80 F.4th at 1026 (9th Cir. 2023) (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959,

9   968 (D.C. Cir. 1982)). "To determine whether a claim is a disguised breach-of-contract claim,

10  we apply the Megapulse test, which considers: (1) the source of the rights upon which the

11  plaintiff bases its claims and (2) the type of relief sought (or appropriate)." Thakur, 148 F.4th at

12  1103. If the plaintiff's rights and remedies, as alleged, "are statutorily or constitutionally based,

13  then district[ ] courts have jurisdiction," but if those rights and remedies "are contractually based

14  then only the Court of Federal Claims does." United Aeronautical, 80 F.4th at 1026 (emphasis in

15  original).

16          **2.    Washington's APA Claims Not Preempted by Tucker Act**

17          Applying the Megapulse test, the Court finds Washington's APA claims are not disguised

18  breach of contract claims impliedly preempted by the Tucker Act.

19          First, applying the Megapulse test, the source of the rights Washington seeks to vindicate

20  are statutory and constitutional, not contractual. Specifically, Washington challenges

21  Defendants' termination of the Awards as an arbitrary and capricious act that violates its rights

22  under the APA and the Constitution. These rights are not contingent on any specific right granted

23  by the Awards themselves, and they exist independent of the Awards. Such a finding is

24

1  consistent with a recent Ninth Circuit determination that APA claims challenging the termination

2  of similar federal agency grants using nearly identical reasoning were "not premised on any

3  rights derived from their grants or any purported contract and thus resolving the claim does not

4  require analyzing the terms of any grant or contract." Thakur, 148 F.4th at 1103. The Court

5  explained that "[c]ontractual rights are not at issue," and that the APA claim was instead based

6  on the agencies' failure to "provide a reasoned explanation for their actions." Id. That same logic

7  applies here.

8         Second, under the second prong of the Megapulse test, the nature of the relief

9  Washington seeks is not properly characterized as money damages, even though Washington

10  seeks an injunction to obtain access to the Award funds. As the Ninth Circuit explained in

11  similar circumstances, such a "request to effectively undo the grant terminations and return

12  Plaintiffs to the status quo does not seek performance of a contractual obligation" and instead

13  "seeks to ensure that the agencies' course of conduct complies with federal law." Thakur, 148

14  F.4th 1108 (citing Bowen, 487 U.S. at 905). The Court further noted that "[a]t this preliminary

15  stage, it appears that any payments due under the grants are 'a mere by-product' of the district

16  court's 'primary function of reviewing' the government's interpretation of its statutory

17  obligations pursuant to the APA." Id. (quoting Bowen, 487 U.S. at 910). The Court similarly

18  finds that the injunctive relief sought does not convert the APA claim into one for monetary

19  damages.

20         In addition, Washington convincingly explains that cooperative agreements, such as the

21  Awards here, are not enforceable under the Tucker Act because they do not confer a direct and

22  tangible benefit to the Government. As explained in a similar case now on appeal, cooperative

23  agreements do not satisfy Tucker Act jurisdiction because they "generally do not confer a

24

1    'direct' and 'tangible' benefit on the United States—a requirement for Tucker Act jurisdiction."

2    Pacito v. Trump, 772 F. Supp. 3d 1204, 1215 (W.D. Wash. 2025) (appeal filed) (citing St.

3    Bernard Par. Gov't v. United States, 134 Fed. Cl. 730, 735–36 (2017), aff'd, 916 F.3d 987 (Fed.

4    Cir. 2019) (finding that cooperative agreement to provide hurricane relief in New Orleans

5    provided no direct or tangible benefit to the Government). To this end, federal law explains that

6    cooperative agreements are intended to be used by government agencies to create a collaborative

7    relationship with a state or local government "to carry out a public purpose of support or

8    stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or

9    barter) property or services for the direct benefit or use of the United States Government."31

10   U.S.C. § 6305(1). This contrasts with procurement contracts which is a "legal instrument" whose

11   "principal purpose . . . is to acquire (by purchase, lease, or barter) property or services for the

12   direct benefit or use of the United States Government." 31 U.S.C. § 6303(1). Given this

13   distinction, the Court of Federal Claims has consistently found that cooperative agreements lack

14   a "money-mandating" feature that is necessary for Tucker Act jurisdiction. See Rick's

15   Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008) ("[Plaintiff's]

16   breach of contract claim arises from its cost-share agreement with the government; however, the

17   cost-share agreement does not provide a substantive right to recover money-damages and

18   [plaintiff] does not point to a money-mandating source of law[.]"); St. Bernard, 134 Fed. Cl. at

19   735 ("Since the Court construes the agreement between the [agency] and the [plaintiff] as a

20   cooperative agreement, damages cannot be implied; therefore, the agreement is not money-

21   mandating, unless the [plaintiff] can point to a specific provision mandating a monetary

22   recovery."). This is another independent basis on which the Court rejects Defendants'

23

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 10

1   jurisdictional arguments, and the Court notes that Defendants failed to provide any meaningful

2   response on this issue.

3         **3.        Defendants' Countervailing Arguments Fail to Persua**de

4         Defendants urge the Court not to follow <u>Thakur</u>, and instead construe two recent <u>per</u>

5   <u>curiam</u> decisions from the Supreme Court as precedent requiring Washington's claims to be filed

6   in the Court of Federal Claims under the Tucker Act. The Court disagrees.

7         First, Defendants invoke <u>Department of Education v. California</u>, where the Supreme

8   Court issued a four paragraph <u>per curiam</u> opinion staying a TRO that enjoined the termination of

9   education-related grants and required the government to pay all amounts due under the grants.

10  <u>Id.</u>, 604 U.S. 650 (2025). The Court concluded "the APA's limited waiver of immunity does not

11  extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the

12  District Court ordered here." <u>Id.</u> at 651. At issue was a TRO that required "the Government to

13  pay out past-due grant obligations and to continue paying obligations as they accrue[d].'" <u>Id.</u> at

14  650. But the Ninth Circuit has correctly noted that this decision has no application to claims like

15  those presented here which seek to vacate the termination of a grant and do not request payment

16  of specific amounts due from the federal government. <u>Thakur</u>, 148 F.4th at 1104. Here,

17  Washington similarly asks the Court to vacate the termination of the Awards and does not

18  request payment of specific sums. (<u>See</u> Proposed Order at 1-2). And while Washington seeks

19  access to the Award funds, the Ninth Circuit found a similar request in <u>Thakur</u> not to contravene

20  <u>California</u>. <u>Thakur</u>, 148 F.4th at 1104. There, the Ninth Circuit held that the request to "vacate

21  the grant terminations and preliminarily enjoin Defendants from giving effect to those

22  terminations" did not run afoul of <u>California</u> because the relief sought was "not based on any

23  conditions or obligations under the grants" and did not seek any finding that the federal

24

1    government owes any amount of money. Id. The Court also notes that the terse decision in

2    California lacks the detail and reasoning necessary to support Defendants' argument that the

3    decision forecloses the Court's jurisdiction. As Justice Kagan noted in her dissent, "the Court's

4    reasoning is at the least under-developed, and very possibly wrong." California, 604 U.S. at 653

5    (2025) (Kagan, J., dissenting).

6        Second, Defendants invoke Nat'l Insts. of Health v. Am. Pub. Health Ass'n ("NIH"),

7    another per curiam Supreme Court opinion that stayed an injunction barring termination of

8    various research-related grants. 145 S. Ct. 2658 (2025). In relevant part, the terse, two-paragraph

9    decision states in full: "The Administrative Procedure Act's 'limited waiver of [sovereign]

10   immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on'

11   the research-related grants or to order relief designed to enforce any """obligation to pay

12   money"" pursuant to those grants.'" Id. (quoting California, 604 U.S. at 651). There is no

13   reasoning in the decision to apply to the case before the Court, and no means of determining

14   whether it has any application to the unique facts at issue in this case. Without any explication of

15   the relevant facts and how they fit within the relevant legal framework, the per curiam decision

16   does not support Defendants' position.

17       Defendants cite to a smattering of other cases that similarly do not convince the Court

18   that it lacks jurisdiction. First, they cite to Climate United Fund v. Citibank, N.A., where the

19   D.C. Circuit concluded that APA claims challenging the termination of $16 billion of grants

20   from the EPA to nonprofits were actually breach of contract claims. Id., ___ F.4th ___, No. 25-

21   5122, 2025 WL 2502881, at *7 (D.C. Cir. Sept. 2, 2025). The facts of this case do not align with

22   those before the Court. In Climate United, the court applied the Megapulse test and held that the

23   sole source of the rights at issue stemmed from the grants alone. Id., 2025 WL 2502881, at *5.

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 12

1    The Court also found that the injunction sought was merely a means for the grantees to obtain

2    specific performance on the grants. Id., at *6. But the grants at issue were not cooperative

3    agreements and the relief sought does not appear to be parallel with what is sought here.

4    Moreover, this out-of-circuit decision appears not to abide by the Ninth Circuit's decision in

5    Thakur, which is far more relevant given the nature of the Awards and the government's

6    terminations. Second, Defendants invoke a Fourth Circuit decision, where the court invoked

7    California to find a request to restore access to grant funds was merely an action to enforce

8    contractual obligations to pay sums to non-profits and municipalities. Sustainability Inst. v.

9    Trump, 2025 WL 1587100 (4th Cir. June 5, 2025). But as with Climate United, this case stands

10   at odds with the outcome in Thakur, which is binding Ninth Circuit precedent that is far more

11   factually aligned. The Court therefore rejects Defendants' arguments and finds that it has

12   jurisdiction.

13   **B.    Preliminary Injunction**

14          The Court finds that Washington is entitled to the preliminary injunction it seeks. The

15   Court reviews the relevant facts and scope of the injunction in the subsections which follow.

16          **1.    Legal Standard**

17          "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed

18   on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3)

19   the balance of equities tips in her favor, and (4) an injunction is in the public interest." Farris v.

20   Seabrook, 677 F.3d 858, 864 (9th Cir. 2012) (citing Winter v. NRDC, 555 U.S. 7, 20 (2008)). A

21   preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear

22   showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22. And it is "never

23   awarded as of right." Id. In each case, the Court "must balance the competing claims of injury

24

1    and must consider the effect on each party of the granting or withholding of the requested relief."

2    Id.

3         The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in

4    Winter. A stronger showing of one element may offset a weaker showing of another. All. for the

5    Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–32 (9th Cir. 2011). So "when the balance of

6    hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious

7    questions going to the merits.'" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir.

8    2019) (quoting All. for the Wild Rockies, 632 F.3d at 1135).

9         In considering the likelihood of success on the merits, the Court is not strictly bound by

10   the rules of evidence, as the "preliminary injunction is customarily granted on the basis of

11   procedures that are less formal and evidence that is less complete than in a trial on the merits."

12   Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). Because of the extraordinary nature of

13   injunctive relief, including the potential for irreparable injury if not granted, a court may consider

14   evidence outside the normal rules of evidence, including: hearsay, exhibits, declarations, and

15   pleadings. Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009).

16       **2.**    **Likelihood of Success**

17        Below, the Court reviews the likelihood of success of Washington's APA and Spending

18   Clause claims.

19        **a.**    **APA Claims**

20        Washington pursues two APA claims arising: the terminations of the Awards were: (1)

21   contrary to law, and (2) arbitrary and capricious. The Court finds Washington is likely to succeed

22   on both claims and that Defendants cannot hide behind the APA's exclusion for decisions

23   committed to agency discretion.

24

1    As an initial matter, the Court notes that there is no dispute that the terminations

2    constitute final agency actions. Washington has provided evidence that the terminations were

3    intended to cease funding immediately, and, at least as to the Tribal Award, Defendants informed

4    them that they had no right to appeal. (See Esquivido Decl. ¶ 38 & Ex. H.) These are final

5    agency actions, as they mark the "consummation of the agency's decisionmaking process" and

6    are ones "by which rights or obligations have been determined, or from which legal

7    consequences will flow." Bennett v. Spear, 520 U.S. 154, 156, 177-78 (1997).

8        **1.    Contrary to Law**

9        "The Administrative Procedure Act requires federal courts to set aside federal agency

10    action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A)—which means, of course, any

11    law, and not merely those laws that the agency itself is charged with administering." F.C.C. v.

12    NextWave Pers. Commc'ns Inc., 537 U.S. 293, 300 (2003).

13        Washington convincingly argues that the terminations violate the OMB regulations and

14    related guidance. Washington argues that the § 200.340(a)(4) only allows for terminations if the

15    award, not the agency's priorities have changed. The Court agrees. The regulation states that the

16    agency can terminate the award "pursuant to the terms and conditions of the Federal award,

17    including, to the extent authorized by law, if an award no longer effectuates the program goals or

18    agency priorities." 2 C.F.R. § 200.340(a)(4). A plain reading of this provision demonstrates that

19    termination is proper only when the "award itself no longer effectuates the program goals or

20    agency priorities," and does not extend to changes in program goals or agency priorities. This

21    makes abundant sense, because an award recipient will undertake efforts based on the articulated

22    program goals at the time the agency requests proposals and awards the grants. This is also

23    consistent with OMB guidance, which emphasizes that agencies should set priorities and

24    establish goals and objectives "before the applications are solicited." 85 Fed. Reg. at 49507.

1    Defendants' reading of the regulations not only fails common sense, but would lead to absurd

2    results. By allowing a change in an administration to upend multi-year grants would cause

3    unnecessary chaos across the vast world of government-supported endeavors undertaken by

4    states, universities, non-profits, and others. Instead, it makes far more common sense to construe

5    the regulation as allowing termination only if the awardee fails to deliver on the program goals

6    and agency priorities as they existed at the time the grant was awarded. Had the regulations been

7    intended to allow for terminations based on changes in an administration's policy or priorities,

8    they could easily have been drafted to state that a change in "program goals or agency priorities"

9    alone can be a basis for termination. But they do not. And Defendants' contrary urging lacks any

10    support in either the text of the regulations or common sense.

11            The Court also finds merit in Washington's argument that Defendants cannot even invoke

12    the regulations on which they rely because the termination provision was not expressly included

13    in the Awards. This argument flows from the fact that the current regulations require the award

14    itself to "clearly and unambiguously" include all bases for potential termination in the awards. 2

15    C.F.R. § 200.211(c)(v); 2 C.F.R. § 200.340(b). Here, nothing in the Award documentation states

16    that either may be terminated because the award no longer effectuates program goals or agency

17    priorities. But Defendants correctly point out that the regulations in force when both awards were

18    made merely stated that the award "should" but did not have to include a citation to §

19    200.340(a)(4) as a basis for termination. But even if the provision was not mandatory,

20    Washington may well succeed in proving that the language should have been included. That said,

21    Defendants might also convince a jury that the regulatory language was incorporated by

22    reference. While the Court finds some merit in Washington's argument, it does not rely on this

23

24

1    argument to reach the conclusion explained in the above paragraph that Washington has

2    demonstrated a strong likelihood of success on the merits of its APA claim.

3                    **2.    Arbitrary and Capricious**

4            Agency actions are arbitrary and capricious when the explanation "'runs counter to the

5    evidence before the agency.'" <u>Organized Vill. of Kake v. USDA</u>, 795 F.3d 956, 966 (9th Cir.

6    2015) (en banc) (quoting <u>Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.</u>

7    <u>Ins. Co.</u>, 463 U.S. 29, 43 (1983)). "'Unexplained inconsistency' between agency actions is 'a

8    reason for holding an interpretation to be an arbitrary and capricious change.'" <u>Id.</u> (quoting <u>Nat'l</u>

9    <u>Cable & Telecomms. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 981 (2005)). A Courts

10   consider "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory

11   explanation' for [its] decision, 'including a rational connection between the facts found and the

12   choice made.'" <u>Dep't of Com. v. New York</u>, 588 U.S. 752, 773 (2019) (quoting <u>Motor Vehicle</u>

13   <u>Mfrs. Ass'n.</u>, 463 U.S. at 43). Agency action is also arbitrary and capricious if the agency

14   "offered an explanation for its decision that runs counter to the evidence before [it], or is so

15   implausible that it could not be ascribed to a difference in view or the product of agency

16   expertise." <u>Motor Vehicle Mfrs. Ass'n.</u>, 463 U.S. at 43.

17           The terminations here appear likely to have been arbitrary and capricious. First, as

18   explained above, the terminations violate the applicable OMB regulations, which do not provide

19   that a change in agency administration is a permissible ground for termination. Moreover, the

20   OMB general guidance issued in 2020 emphasizes that agencies should to set priorities and

21   establish goals and objectives "before the applications are solicited." 85 Fed. Reg. at 49507; <u>see</u>

22   <u>also</u> 2 C.F.R. § 200.202. This supports Washington's view that a change in priorities after grant-

23   making would run afoul of the regulations. Second, the brief termination letters fail to articulate

24

what the new priorities and standards might be that would form a reasoned basis for termination. One is effectively left to guess at what the new priorities are and why the awards are now misaligned with them—this violates the APA. Third, Washington is likely to be able to demonstrate the falsity of Defendants' claims that the Tribal Steward Award "lacks specific performance indicators, timelines, or mechanisms for evaluating success," or their assertion that EFCR "proposes yet another layer of planning and outreach despite the existence of several prior state- and federally-funded initiatives that already identified the same needs." (Esquivido Decl. Ex. E.) As Washington points out, there are concrete performance indicators, timelines, and means of measuring success of the Tribal Stewards Awards. (Esquivido Decl. ¶¶ 18-24, 33-37.) As to the EFCR Award, Plaintiff points out that the scope of work includes novel work by Ecology that cannot be redundant given its unique scope. (Gostic Decl. ¶¶ 7, 25; Declaration of Joenne McGerr ¶¶ 21-22 (Dkt. No. 9).)

Accordingly, the Court finds that Washington is highly likely to succeed on its "arbitrary and capricious" APA claim.

### 3.    APA's Exception for Discretionary Decisions Does Not Apply

Defendants argue the terminations are not reviewable under the APA because it is "committed to agency discretion by law" and therefore exempt under 5 U.S.C. § 701(a)(2). (Defs. Opp. at 10-12.) The Court disagrees.

"The Administrative Procedure Act embodies a 'basic presumption of judicial review,' Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A)." Dep't of Com. v. New York, 588 U.S. 752, 771 (2019). "Most—but not all—final agency actions are reviewable,"

1    subject to two exceptions. <u>Trout Unlimited v. Pirzadeh</u>, 1 F.4th 738, 751 (9th Cir. 2021).

2    Defendants highlight one exception to APA's presumption of judicial review—for "agency

3    action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

4         The Supreme Court has "read the § 701(a)(2) exception for action committed to agency

5    discretion quite narrowly, restricting it to those rare circumstances where the relevant statute is

6    drawn so that a court would have no meaningful standard against which to judge the agency's

7    exercise of discretion." <u>Dep't of Com.</u>, 588 U.S. at 772 (citation and quotation omitted). The

8    APA expressly contemplates judicial review of an agency's ordinary discretionary judgments by

9    authorizing review of an agency's action for "abuse of discretion." 5 U.S.C. § 706(2)(A). The

10   Section 701(a)(2) exception therefore applies only "if no judicially manageable standards are

11   available for judging how and when an agency should exercise its discretion." <u>Trout Unlimited</u>, 1

12   F.4th at 751 (quoting <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1985)). "Only where there is truly

13   no law to apply have we found an absence of meaningful standards of review." <u>Perez Perez v.</u>

14   <u>Wolf</u>, 943 F.3d 853, 861 (9th Cir. 2019) (internal quotation marks omitted). "So long as the

15   regulations provide a 'meaningful standard' by which a court could review the [agency's] actions

16   and our review of the agency's compliance with those regulations does not infring[e] any of the

17   [agency's] prerogatives under the statute, then we have jurisdiction, pursuant to the APA, to

18   review the agency's compliance with its own regulations." <u>Trout Unlimited</u>, 1 F.4th at 752

19   (citation and quotation omitted).

20        Judicially-manageable standards against which to measure agency action can derive from

21   a variety of sources, not just regulations and statutes. "In order to assess whether the court has a

22   meaningful standard against which to judge the agency's exercise of discretion[,] we first look at

23   the statute itself." <u>ASSE Int'l, Inc. v. Kerry</u>, 803 F.3d 1059, 1069 (9th Cir. 2015) (cleaned up).

24

1    The Court may also look to agency regulations or agency practices to determine a meaningful

2    standard against which to review its exercise of discretion. Id. at 1069 ("Even where statutory

3    language grants an agency unfettered discretion, its decision may nonetheless be reviewed if

4    regulations or agency practice provide a meaningful standard by which this court may review its

5    exercise of discretion.").

6        Here, the regulations and Guidance set a meaningful standard of review against which to

7    measure the Award terminations. The regulations clearly set forth the basis for terminations of

8    cooperative agreements, such as the Awards at issue here. As is relevant here, the agency had the

9    ability to terminate the Awards "pursuant the terms and conditions of the Federal award,

10   including, to the extent authorized by law, if an award no longer effectuates the program goals or

11   agency priorities." 2 C.F.R. § 200.340(a)(4) (2024). As the Ninth Circuit has recently explained:

12   "2 C.F.R. § 200.340(a) provides uniform administrative requirements for the termination of

13   federal grants, including those an agency terminates because they 'no longer effectuat[e] . . .

14   agency priorities.'" Thakur, 148 F.4th at 1105 (quoting 2 C.F.R. § 200.340(a)(4)). Citing

15   Sections 200.340, 200.341, 200.343, and 200.345, the Court explained that "[t]hese regulations

16   provide a meaningful standard by which courts may review the agencies' exercise of discretion."

17   Id. at 1105-06. This fully undermines Defendants' position, which the Court rejects.

18       Defendants rely on Lincoln v. Vigil, 508 U.S. 182 (1993) to argue that the terminations

19   are unreviewable. (Defs. Opp. at 10-11.) In Vigil, the Supreme Court held that "allocation of

20   funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as

21   committed to agency discretion." 508 U.S. at 192–93. But the Court expressly limited its

22   holding, clarifying that "an agency is not free simply to disregard statutory responsibilities:

23   Congress may always circumscribe agency discretion to allocate resources by putting restrictions

24

1  in the operative statutes." Id. at 193. As the Ninth Circuit in Thakur recognized, the operative

2  regulations here do just that, rendering Vigil's limited holding inapposite.

3  　　　　　　**b.  Spending Clause Claim**

4  　　　　Washington argues that Defendants' termination of the Awards also violates the

5  Spending Clause of the U.S. Constitution by imposing conditions on the Awards well after they

6  were granted. The Court finds that it is likely to succeed on the merits of this claim.

7  　　　　The Spending Clause provides that Congress has the power "to pay the Debts and provide

8  for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

9  This power gives Congress the ability "to grant federal funds to the States, and [Congress] may

10 condition such a grant upon the States' 'taking certain actions that Congress could not require

11 them to take.'" Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 576 (2012) ("NFIB")

12 (quoting Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 686,

13 (1999)). "Though Congress' power to legislate under the spending power is broad, it does not

14 include surprising participating States with post acceptance or 'retroactive' conditions."

15 Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 25 (1981).

16 　　　　Washington argues that Defendants have violated the Spending Clause by using "new

17 priorities" that are impermissibly vague. As the Supreme Court has explained, "if Congress

18 intends to impose a condition on the grant of federal moneys, it must do so unambiguously."

19 Pennhurst, 451 U.S. at 17. From this statement, Washington reasons that any new administrative

20 priority used to justify termination of the award is impermissibly vague. The Court finds merit in

21 this argument, as permitting the reasoning advanced in the terminations here would allow any

22 new executive administration to upend any multi-year cooperative agreement for whatever new

23 priority it might identify. This is not a means of conducting the business of government, which

24 requires predictability and consistency. Defendants' only real retort is to argue that the

1    terminations did not impose any "condition" and merely followed the regulatory process outlined

2    in the CFRs. This argument lacks any fealty to the regulations or any persuasive merit.

3          Washington also reasonably argues that the retroactive termination constitutes an

4    impermissible condition that violates the Spending Clause. Defendants suggest that they merely

5    followed the regulatory guidance and terminated the grants in accordance. But the regulations do

6    not provide for the kind of post-hoc rationalization that Defendants urge. The Court sees little

7    merit in this argument. Instead, the Court finds Washington likely to succeed in demonstrating

8    that the terminations here are equivalent to impermissible post-hoc conditions because the

9    original Awards had no provisions to allow new agency policies to upend existing awards.

10        **3.**    **Irreparable Harm**

11          The Court finds that Washington faces irreparable harm without the injunction.

12          Irreparable harm is "harm for which there is no adequate legal remedy, such as an award

13    for damages." Arizona Dream Act Coalition v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014).

14    "For this reason, economic harm is not generally considered irreparable." E. Bay Sanctuary

15    Covenant v. Biden, 993 F.3d 640, 677 (9th Cir. 2021). "But where parties cannot typically

16    recover monetary damages flowing from their injury—as is often the case in APA cases—

17    economic harm can be considered irreparable." Id. (citing California v. Azar, 911 F.3d 558, 581

18    (9th Cir. 2018)). "Intangible injuries may also qualify as irreparable harm, because such injuries

19    'generally lack an adequate legal remedy.'" Id. (quoting Brewer, 757 F.3d at 1068).

20          The record here is sufficient to show an irreparable harm. As Washington notes, both

21    Awards are designed to help the State build climate resilience to reduce disparate health impacts

22    of climate change on "overburdened communities." By removing the funding and collaborative

23    guidance, the State is less able to protect these communities and prepare against the negative

24

1  effects of climate change. These are the kinds of injuries that money cannot necessarily solve, as

2  lost time itself can make future response to climate change yet more difficult. That alone is

3  sufficient to find an irreparable harm. In addition, the State has provided detailed information of

4  the harms caused by the loss of funding to both awards. As to the Tribal Stewards program,

5  Washington points out that it is intended to create various partnerships and hundreds of co-

6  steward positions. (Esquivido Decl. ¶¶ 21-26.) Without the funding, the State explains that it will

7  be unable to build future partnerships with Tribes and community colleges, and the State will

8  lose credibility in efforts to work collaboratively with the Tribes. (Id. ¶¶ 39-59.) As to the EFCR

9  Award, the State explains that it will lose an opportunity to engage in equitable resource

10  allocation to help vulnerable coastal communities, reduce effectiveness and coordination,

11  increase decision-making uncertainty, and render Washington's investment in the program a

12  sunk cost. (Gostic Decl. ¶¶ 28-32.) While it is true that the harm here stems from the lack of

13  funds, the harms cannot be remedied solely with funds provided in the future. And the

14  reputational damage and inability to build trust with the Tribes further supports a finding of

15  irreparable harm.

16      Defendants argue that there is no evidence of irreparable harm because Washington

17  waited three months to file suit after the Awards were terminated. (Defs. Opp. at 8 (citing

18  N.L.R.B. v. Cal. Pac. Med. Ctr., 991 F.2d 536, 544 (9th Cir. 1993) (A "long delay before seeking

19  a preliminary injunction implies a lack of urgency and irreparable harm.")).) But as the Ninth

20  Circuit noted in the same case Defendants cite, "[d]elay by itself is not a determinative factor in

21  whether the grant of interim relief is just and proper." N.L.R.B., 991 F.2d at 544 (citation and

22  quotation omitted). Here, the delay is not dispositive. While Washington could have acted

23  sooner, that fact alone does not undermine the evidence of irreparable injury. And full resolution

24

1  of the claims advanced may take more than a year, and the programs at issue could long be

2  dismantled and unable to recover without injunctive relief. Accordingly, the Court declines to

3  adopt Defendants' position.

4       **4.**              **Balance of Equities and Public Interest**

5       The final two Winter factors merge in cases where relief is sought from the government.

6  Roman v. Wolf, 977 F.3d 935, 940-41 (9th Cir. 2020). When considering whether to grant a

7  preliminary injunction, the Court "must balance the competing claims of injury and must

8  consider the effect on each party of the granting or withholding of the requested relief . . . [and]

9  pay particular regard for the public consequences." Winter, 555 U.S. at 24. As the D.C. Circuit

10 has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency

11 action." League of Women Voters of United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016).

12 To the contrary, an injunction serves the interests of the general public where it ensures that

13 federal agency actions "comply with the Constitution." See Hernandez v. Sessions, 872 F.3d

14 976, 996 (9th Cir. 2017).

15      The Court finds the final two Winter factors favor the issuance of an injunction. Allowing

16 this kind of agency about-face, which appears likely to be found unlawful, would not serve any

17 public interest. Preserving the status quo and allowing a complete resolution of the claims

18 without the downstream harms to the underlying programs serves Washington's interest and the

19 public's interest by ensuring an orderly administration of taxpayer funds.

20      The Court finds no merit in Defendants' contrary arguments. Defendants again invoke

21 California and NIH to suggest that any frustration of the president's policies or payment of funds

22 that cannot be clawed back outweighs any countervailing interest. (Defs. Opp. at 20.) But in

23 California, the respondents had "not refuted the Government's representation that it is unlikely to

24

1    recover the grant funds once they are disbursed." <u>California</u>, 145 S. Ct. at 969. Here, no such

2    facts have been proposed. And the Court noted that the government had compellingly argued

3    "respondents would not suffer irreparable harm[,]" explaining that respondents had "the financial

4    wherewithal to keep their programs running" and could, if they prevailed, "recover any

5    wrongfully withheld funds." <u>Id.</u> Here, no such facts are in evidence. Similarly, <u>NIH</u> has no

6    persuasive application here. There, the Court opined that the inability of the government to

7    recoup funds from the grantee would lead them to be "irrevocably expended." 2025 WL

8    2415669, at *1 (quotation omitted). But here, there are no facts to suggest that the funds could

9    not be recouped or would be irrevocably expended. Neither case compels the Court to decline to

10   issue the injunction, and the Court rejects Defendants' arguments premised on these cases.

11   **C.    Bond & Stay**

12         The Court finds that Washington may proceed with payment of a nominal bond. Under

13   Rule 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only

14   if the movant gives security in an amount that the court considers proper to pay the costs and

15   damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R.

16   Civ. P. 65(c). "Despite the seemingly mandatory language, Rule 65(c) invests the district court

17   with discretion as to the amount of security required, if any." <u>Johnson v. Couturier</u>, 572 F.3d

18   1067, 1086 (9th Cir. 2009) (cleaned up). Defendants argue that the Court should require a bond

19   because "any preliminary relief would potentially mandate that the Executive spend money that

20   may be lost forever once distributed." (Defs. Opp. at 28.) But there is no evidence that the funds

21   could not be recouped. And based on the record before the Court, the funds have already been

22   appropriated by Congress. Thus, any "cost to the government, in the event it is found to have

23   been wrongfully enjoined, would be minimal." <u>Barahona-Gomez v. Reno</u>, 167 F.3d 1228, 1237

24

1    (9th Cir. 1999). As such, the Court finds that only a nominal bond is necessary. The Court

2    ORDERS Washington to deposit a cash bond in the amount of $100 into the Court's registry.

3    <u>See</u> Fed. R. Civ. P. 67. These funds may not be withdrawn except by further order of the Court.

4    <u>See</u> Fed. R. Civ. P. 67(b); 28 U.S.C. § 2042.

5        Defendants ask the Court to stay the injunction pending any appeal authorized by the

6    Solicitor General, or at least administratively stay the case for seven days so the Government can

7    consider an emergency stay from the Court of Appeals. The Court declines this request, as

8    Defendants fail to identify the relevant standard, much less explain why such extraordinary relief

9    should be issued.

10                                  **CONCLUSION**

11        The Court here finds that it has jurisdiction over the dispute and that Washington has

12    demonstrated its entitlement to a preliminary injunction. Washington has demonstrated a

13    likelihood of success on the merits of its APA and Spending Clause claims, irreparable harm,

14    and reasons why the balance of equities and public interest favor injunctive relief. The Court

15    therefore GRANTS the Motion and ORDERS as follows:

16        1.    Defendants and all their respective officers, agents, servants, employees and

17    attorneys, and any person in active concert or participation with them who receive actual notice

18    of this Order are hereby ENJOINED from the following:

19        a.    Terminating the Washington State Department of Ecology's award with  the

20            Federal Award ID Number NA23NOS4190137 and the Washington State Board of

21            Community and Technical Colleges' award with the Award Number

22            NA24OARX417C0590, except in accordance with the requirements set forth in the 2

23            C.F.R. Part 200 and the express terms and conditions of each award; and

24

1    b.    Impeding Washington's access to the full amount of funds obligated to

2    Washington through each of the above referenced awards;

3    2.    Defendants must immediately take every step necessary to effectuate this Order,

4    including clearing any administrative, operational, or technical hurdles to implementation, and

5    notifying the Washington State Department of Ecology and the State Board for Community and

6    Technical Colleges that the terminations have been set aside;

7    3.    Defendants' attorneys shall provide written notice of this Order to all Defendants

8    and agencies and their employees or contractors with responsibility for administering the above

9    referenced awards within five (5) days of this Order. Defendants shall file a copy of the notice on

10   the docket at the same time;

11   4.    Washington must deposit a $100 cash bond into the Court's registry; and

12   5.    This preliminary injunction remains in effect pending further orders from this

13   Court.

14   The clerk is ordered to provide copies of this order to all counsel.

15   Dated October 22, 2025.

16

17   Marsha J. Pechman
     United States Senior District Judge

18

19

20

21

22

23

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 27